TIMOTHY P. DALY, Appellant, v. ROBERT D. BEERY, as County Auditor of Grant County, North Dakota, Thomas Mc-Dowell, Henry Hertz, and Peter Ferguson, as the Board of County Commissioners of Grant County North Dakota, Respondents.

(178 N. W. 104.)

**Constitutional law — statute providing for state publication committee held valid.**

> This action involves the constitutionality of chapter 188, Laws 1919.
> It is *held*:

1. That the act does not contravene the 14th Amendment to the Federal Constitution.

**Courts — four judges of supreme court necessary to declare statute constitutional.**

2. Inasmuch as two of the judges of the supreme court are of the opinion that the act does not violate any provision of the state Constitution, it cannot be said that the act is unconstitutional as violative of the state Constitution, in view of § 89 of the Constitution as amended (Laws 1919, article 25, p. 503) ; which provides that in no case shall any legislative enactment or law of the state of North Dakota be declared unconstitutional unless at least four of the judges of the supreme court so decide.

Opinion filed April 20, 1920.

Appeal from the District Court of Grant County, *Crawford,* J.

From an order sustaining a demurrer to the complaint, defendants appeal.

Reversed.

*E. R. Lanterman,* for appellant.

No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only, as to so much thereof as shall not be expressed. Section 61 of the state Constitution.

If the title expresses a general purpose, all matters fairly reasonably connected with that purpose and all measures which would facilitate its accomplishment, would not be in conflict with the above position of the Constitution. Van Hasen v. Heames (Mich.) 56 N. W. 22; People v. Linda Vista Irrig. Dist. (Cal.) 61 Pac. 86, 89; Re Hegne-Hendrum Ditch, 82 N. W. 1096.

Any provision of the statute incidentally connected with or leading to the subject or object expressed in the title will be included by it. State v. Hass, 2 N. D. 202; State v. Woodmanse, 1 N. D. 246; State v. Barnes, 3 N. D. 319.

The mandate of the Constitution is observed if the legislation in the body of a statute is germane to the general object expressed in the title of the act in which it appears. The test is whether such legislation is relevant or appropriate to such subject. El Paso Co. v. Teller

County (Colo.) 76 Pac. 368; Pioneer Irrig. Dist. v. Bradburg (Idaho) 68 Pac. 295; Diana Shooting Club v. Lamore (Wis.) 89 N. W. 880.

*W. A. Anderson* and *Foster & Baker,* as amici curiæ

A county is merely a governmental subdivision of the state, and as such is but an agency of the state, subject to legislative control. Great Northern R. Co. v. Stevens County (Wash.) 183 Pac. 65; Miller v. Henry, 60 Or. 4, 124 Pac. 197; Yellowstone County v. First Trust & Sav. Bank, 46 Mont. 439, 128 Pac. 596; Cumberland County v. Harnett County, 157 N. C. 514, 73 S. E. 195; Burgin v. Smith, 151 N. C. 561, 66 S. E. 607; State v. Board of Comrs. 36 S. D. 606, 156 N. W. 101; 15 C. J. p. 388, § 1, p. 420, § 53, p. 632, § 347.

Rules and regulations for local county government and control, except as otherwise provided for in the Constitution, are as much within the control of the state as those matters which are more general and statewide. Meehan v. Shields, 57 Wash. 619, 107 Pac. 835; Williams v. Morehouse Parish Police Jury, 135 La. 445, 65 So. 604; Burleigh County v. Kidder County, 20 N. D. 27, 125 N. W. 1063; 15 C. J. 632, § 347g 1; 7 R. C. L. 923, 926, note 3,938, § 15, 943, note 9, citing Pierson v. Minnehaha County, 28 S. D. 534, 124 N. W. 212, 38 L.R.A. (N.S.) 261, 267 and note; note in 27 L.R.A.(N.S.) 1128; Storey v. Murphy, 9 N. D. 115, 81 N. W. 23.

The Constitution does not limit the supervision by the state of fiscal affairs of counties. The state also has the power to say what the duties of county officers shall be. State v. Board of Comrs. 36 S. D. 621, 156 N. W. 101; State v. Lewis, 18 N. D. 133, 119 N. W. 1037.

Section 61 of the Constitution of North Dakota, providing that no bill shall embrace more than one subject, does not require an act creating the commission and a separate act for each duty of the commission. Great Northern R. Co. v. Duncan (N. D.); State ex rel. Gaulke v. Turner, 37 N. D. 635, 164 N. W. 924; 36 Cyc. 951 (II.) and note 6 with case cited therein; 32 Ark. 414, 420, 421, citing Cooley, Const. Lim. 142; Arbuckle v. Pflaeging (Wyo.) 123 Pac. 918.

*Sullivan & Sullivan* and *T. F. Murtha,* for respondents.

The Constitution is mandatory upon the court and the legislature.

State v. Nomland, 3 N. D. 427; Re Corliss, 16 N. D. 427; Cooley, Const. Lim. 36, 6th ed. pp. 88–98, 168, 179, 180; 12 C. J. 470, § 145; State v. Schultz (N. D.) 174 N. W. 81.

The courts take judicial notice of the history of bills on their passage through the legislature. State v. Schultz (N. D.) 174 N. W. 81; Somers v. State (S. D.) 58 N. W. 804; 16 Cyc. 907; Cooley, Const. Lim. 6th ed. p. 162.

The question of whether or not an amendment is such as to change the original purpose of a bill is a question of law for the court. Re House Bill No. 250 (Colo.) 57 Pac. 49; Re House Bill, No. 321 (Colo.) 21 Pac. 472; Sackrider v. Saginaw Co. (Mich.) 44 N. W. 165; Weis v. Ashley (Neb.) 81 N. W. 318; Pottawatomic Co. v. Alexander (Okla.) 172 Pac. 436; State v. Chong Ben (Or.) 173 Pac. 258; 36 Cyc. 951 (11).

The title to the act is not broad enough to cover the designation of official newspapers. Railroad v. Smythe, 103 Fed. 376; Simpson v. Union Stock Yards Co. (Kan.) 110 Fed. 799; Sockrider v. Supervisors (Mich.) 44 N. W. 165; Weis v. Ashley (Neb.) 81 N. W. 318; State v. Chong Ben (Or.) 173 Pac. 258.

"It is not enough that the act embraces but a single subject or object, and that all its parts are germane. The title must express that subject, and comprehensively enough to include all of the provisions in the body of the act." Sutherland, Stat. Constr. p. 87; Astors v. Railroad Co. (N. Y.) 30 N. E. 594; Boom Co. v. Prince, 34 Minn. 79, 24 N. W. 361; State v. Kinsella, 14 Minn. 524, Gil. 305; State v. Smith, 35 Minn. 257, 28 N. W. 241; Brown v. State, 79 Ga. 324, 4 S. E. 861; State v. Everage, 33 La. Ann. 120; Brooks v. People (Colo.) 24 Pac. 553; Montgomery v. State, 88 Ala. 141, 7 So. 51; Igoe v. State, 14 Ind. 239; Sanilac County v. Auditor General, 68 Mich. 659, 36 N. W. 794; Crubbs v. State, 24 Ind. 205.

GRACE, J. The plaintiff, a taxpayer, resident, and elector of Grant county, brings this action against the defendants, to restrain and enjoin them from causing the official printing and publications of the county of Grant to be published or printed in any newspaper of Grant county, other than the Grant County Leader; and from paying, or causing to be paid, any of the money of Grant county, for any county and official printing or publication, to other than the Grant County Leader.

The complaint, in substance, sets forth: That the plaintiff is a resident, elector, and taxpayer of Grant county; that Beery is the duly elected, qualified, and acting county auditor of Grant county, and that the other defendants above named are the duly qualified and acting county commissioners thereof; that the Grant County Leader is printed and published in that county, and was, about the 1st day of August, 1919, by the state publication and printing commission, under the provisions of chap. 188 of the Session Laws of 1919, designated as the official newspaper in and for that county; that the county commissioners above mentioned, in disregard of the provisions of chap. 188, at the first meeting of the board, held in Carson, the county seat of Grant county, did, on the 5th day of January, 1920, by resolution, designate three newspapers, other than the Grant County Leader, as the official papers in and for Grant county; namely, Carson Press, New Leipzig Sentinel, and Shield Enterprise; that none of said papers last mentioned were designated as official newspapers by the state publication and printing commission, though they have complied with the requirements of article 82 of chap. 38, of the Political Code of the state of North Dakota, as contained in the Comp. Laws 1913; that the defendants, at their January, 1920, meeting, awarded to the said three newspapers official reports of the board of county commissioners, for publication, and that they have printed and published the same; and that, unless the defendants are restrained, they will continue to cause the publication of all subsequent proceedings of said board of county commissioners, and all legal and official printing and publication of Grant county, to be published and printed in the three newspapers above mentioned; and, unless restrained and enjoined, will cause the money of Grant county to be expended, for said publication and printing at legal rates.

The defendants demurred to the complaint, on the grounds that it does not state facts sufficient to constitute a cause of action.

The demurrer, in further allegations, challenges the constitutionality of chap. 188, claiming it is unconstitutional on the ground that it is in conflict with chapters 58 and 61, and what is commonly designated as the home-rule provisions of the Constitution, which are §§ 166 to 173, inclusive; and further claim that it contravenes the 14th Amendment to the Constitution of the United States; and maintain that it abridges their privileges and immunities, as citizens of the United States, and

deprives them, as such, of due process of law; and maintain that the law in question confers an arbitrary and unreasonable power upon the state publication and printing commission, by conferring upon them the authority to name the official newspapers of the various counties of the state, in which the publication of process and notices, and other matters, the publication of which is required or authorized by law, must be published. The demurrer was heard before W. C. Crawford, Judge, who entered an order sustaining it.

We may consider the sections of the Constitution involved, in the order in which they are above set forth. Section 58 thereof is as follows: "No law shall be passed except by a bill adopted by both houses, and no bill shall be so altered and amended on its passage through either house as to change its original purpose."

Section 61 is as follows: "No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed."

In the preamble, found at the very beginning of our Constitution, and as an appropriate heading to the Bill of Rights, which consists of the first twenty-four sections thereof, stand the following expressive words: "We, the people of North Dakota, grateful to Almighty God for the blessings of civil and religious liberty, do ordain and establish this Constitution."

Section 2 of the Bill of Rights is as follows: "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have a right to alter or reform the same whenever the public good may require."

By § 25 of the Constitution, prior to its amendment by article 26, the legislative power was vested in a senate and house of representatives. Since its amendment, the legislative power is vested in the house and senate, excepting as reserved to the people, by the constitutional amendment to § 25, which provides a method for the initiating of law, by the people, irrespective of the legislature, and the referending of laws enacted by the legislature, each of such powers to be exercised under the conditions named in said constitutional amendment.

The will of the people, as expressed in law by the legislature or a law initiated and adopted by them, or law passed by the legislature

and referended, and favorably passed upon by them, is the supreme law of this state, and can be declared invalid by the courts, only for two reasons, *viz.:* (1) That it is contrary to a provision or provisions of the Constitution of the state; (2) that it contravenes a provision or provisions of the Constitution of the United States.

If a law duly enacted by any of the methods above mentioned is not invalid for either of the causes above stated, it stands as an expression of the supreme will of the people of this state, and, under the Constitution, the courts have neither authority nor power to declare it invalid.

In this connection, it is well to bear in mind, that the powers of government, either state or Federal, are divided into three separate classes, *viz.,* legislative, executive, and judicial. These powers are exercised by three distinct and separate branches of government, corresponding in name with the classes of powers mentioned.

If each of the branches, in consonance with the provisions of the Constitution, would exercise such powers only, as is thus distributed to it, and will fully recognize that the other co-ordinate branches of the government have certain duties distributed to each of them, which it is their right, duty, and privilege under the Constitution, exclusively to exercise, the harmonious operation and conduct of government, and the exercise of governmental powers, would become less difficult, and there would be less conflict in the operation of such delegated powers, and the supreme will of the people, when legally expressed, under the Constitution, would much more readily be carried into effect.

With these observations in mind, we may proceed to determine whether the charge, that chap. 188 is unconstitutional, contains any merit. If it is not unconstitutional, it must follow that it is a valid and subsisting law, and that it has been such ever since thirty days after its adoption by the voters, at an election held pursuant to law, where it was voted upon as a referended measure and there received a majority of the votes voting thereon.

The law is claimed to be unconstitutional, and contrary to the provisions of § 58 of the Constitution, in this,—that the bill for the act was so altered and amended, in its passage in the senate, as to change its original purpose.

Chapter 188 was Senate Bill No. 157. The original purpose of the bill as expressed in its title, as originally introduced, is as follows: "An

Act Creating a State Publication and Printing Commission, Prescribing Its Duties and Powers, and Repealing All Acts and Parts of Acts Conflicting Therewith."

It made no reference to the appointment of an official newspaper in the counties in which should be printed the official proceedings of the board of county commissioners of the county, or in which all legal notices were required to be published. While, in the bill, as amended, and as it became a law, such provisions were inserted.

The full requirements, in this regard, may be better understood from a reading of chap. 188.

It is claimed that this change in the bill, this amendment, changed the original purpose of the bill, and for this reason, the law, under § 58, is rendered unconstitutional. With this contention, we disagree.

The purpose of the original bill was to create a state publication and printing commission, and the prescribing of its duties and powers.

An examination of the title of the bill will disclose that the bill intended to create a state publication commission and a state printing commission. These state the original purpose of the bill.

Publication and printing, each, have a well-understood signification. Publication means to make known, a notification to the public at large, either by words, writing or printing. Printing means the impress of letters or characters upon paper, or upon other substance.

The first implies the means of conveying knowledge or notice; the second implies a mechanical act. Any means, therefore, which would give notice to the public, of any matter desired to be brought to their knowledge, would be classed as publication.

Though the bill as introduced contained no reference to the appointment of an official newspaper in each of the counties of the state, in which all legal publications were required to be made, the original purpose of the bill was not changed by the amendment which did so provide for the amendment, as will be disclosed by a reading of chap. 188, which relates to publication of certain matters, and though they are not included in the original bill, they were matters connected with its purpose, *viz.,* publication.

The title of the original bill also contained words which would direct attention to the fact that the duties and powers of the state publication commission were set forth in the bill, and hence one's attention is there-

by immediately directed to the bill, to determine what those powers are.

If the powers and duties are such that, when exercised, they relate to some matter of which it is desired to give the public notice; in short, if they relate to publication, they are within the purpose of the original bill, and germane to it.

The real purpose and intent of the bill, as amended, and which became chap. 188, is expressed by § 5 thereof, which is as follows: "The intent of this act is to co-ordinate publication of all state legal notices, publications, reports and laws of every kind and nature and under one supervising head, to have definite and certain legal newspapers in this state, so that information can be readily secured concerning any legal publication, and to economize in the matter of state printing; and to keep a complete system of files where legal publications of every kind, in the state can be readily found. This act shall receive a liberal construction in order to effectuate the purposes and intent thereof."

It will thus be seen that the interpretation which the legislature has placed upon the purpose and intent of the law relates largely to publication of certain matters which are of vital interest to the public.

The title of the original bill provides for a state publication commission, and prescribed its powers and duties; and the intent of the law, as amended, is in consonance with the duties, powers, and purpose of the state publication commission, and deals largely with the matter of publication.

So long as the amendment related to publication, or the powers and duties of the commission, it is germane to the purpose expressed in the original bill.

Another very important matter to be taken into consideration is that § 25 of the Constitution has been amended so that the legislative power of the state is not exclusively vested in the legislature.

The people, by constitutional amendment, article 26, reserve the power, first to propose measures and to enact or reject the same, as proposed. Second, to approve or reject, at the polls, any measure or item, section, part, or parts of any measure, enacted by the legislature.

Each of these powers is a legislative power, and, if procedure is had under either, it must be by petition, as prescribed by law.

If the legislature pass a valid act, which does not contain an emergency clause, and the whole of the act is referended, it does not become

a law until approved by a majority of the votes cast thereon, and then not until thirty days after the time of election, at which such law is voted upon.

Article 26 of the Constitution, which amends § 25, provides: A petition initiating or referending a law shall have printed thereon a ballot title, which shall fairly represent the subject-matter of the measure, and the names of at least five electors, who shall constitute the committee for the petitioners, and who shall represent and act for the petitioners.

As we construe that language, it is not necessary that the ballot title on a referendum petition shall be the same as the title of the act referended; that is, it is not necessary that the ballot title be identical in words and language with the title, as passed by the legislature. But, that such ballot title is sufficient, so far as the title thereof is material, if it fairly represent the subject-matter of the measure.

From this it would appear that the filing of a referendum petition, containing a ballot title, as required by article 26, is a separate and independent legislative step, by the people, to legislate upon the subject-matter of the law referended; that the title of the act, as passed by the legislature, has no peculiar bearing, nor does it govern as to what the ballot title on the petition shall be. For, in referending a law, the people are acting in their sovereign capacity, and independent of the legislature, in exercising the legislative power reserved to them.

Under article 26 the secretary of state is required to print and mail to each elector a publicity pamphlet, containing a copy of each measure, together with its ballot title, to be submitted at any election; and, by requiring such publication, the people are acting in the legislative capacity.

When a valid act passed by the legislature has been referended, and the steps required by article 26 have been taken, in referending such act, and a majority of the voters voting upon such act vote favorably thereon, at a state-wide election, or at a special election called pursuant to law, such act becomes a law, by reason of the exercise of the legislative power of the people, and not by reason of the exercise of legislative power by the legislature.

It may be concluded that if the constitutionality of chap. 188 were to be measured by § 58 of the Constitution, exclusively, which we will

show, in a subsequent paragraph, is not true, it would, nevertheless, as we view the matter, be a valid act, as it is not contrary to the provisions of that section, in that the purpose of the act is not changed, though the scope of it, to some extent, may be; but this is not sufficient reason to declare the act a contravention of that section.

This act is also attacked on the ground that it is contrary not only to § 58, but to § 61 of the Constitution.

We will now discuss these two constitutional provisions from another viewpoint, and, perhaps, will be able to show their inapplicability, as organic law, with which to measure the constitutionality of the act in question, in that they are applicable only to acts passed by the legislature, and not to acts initiated by the people or acts of the legislature referended by them. In other words, the Constitution has been amended, and a provision inserted in it, by which the title of laws initiated by the people, or an act of the legislature by them referended, is exclusively governed.

This is a specific provision of the organic law, adopted at a time subsequent to the time of adoption of §§ 58 and 61, which governs, exclusively, in what are necessary requirements of the enacting clause in initiative measures, and, as well, what shall constitute the title thereof, or the title to laws referended, when the same are voted upon, as prescribed by such amendment, which is article 26.

Manifestly, what is a proper title to an initiated or referended law should not be determined by §§ 58 or 61, but by article 26, which was specifically enacted and adopted, as part of the Constitution of this state, for the purpose of determining what is necessary to be stated and set forth in the title of either an initiated measure, or a law which has been referended. The case of State ex rel. Gibson v. Richardson, 48 Or. 310, 8 L.R.A.(N.S.) 362, 85 Pac. 225, has been cited in support of respondents' contentions, with reference to chap. 188 being in contravention of § 61 of the Constitution. As we view the matter, that case is not authority for respondents' contention.

Section 20 of article 4 of the Constitution of Oregon provides that "every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title."

This is, in substance, largely synonymous with § 61 of our Constitution.

Article 4 of the Constitution of Oregon was amended so as to provide for the initiative and referendum. The provisions therein, in that regard, are largely synonymous with those of article 26, with this important exception,—no provision is made for what shall be stated in the title of an initiated measure, by the petition or otherwise, nor any provision for a ballot title to an initiated measure or a referended act, as does our article 26; and, hence, under the Oregon Constitution, as amended, whether the title to an initiated measure or the title to a referended act embraces more than one subject is a question to be determined by § 20 of article 4 of its Constitution, in the same manner as if the same question arose in reference to an act passed by the legislature, exclusively.

While, on the other hand, § 61 of our Constitution is not the organic law of our state, which determines the validity and sufficiency of a title to an initiated measure, or an act of the legislature referenced to the people, but that is solely and exclusively determined by article 26, which provides what the ballot title shall contain, how it shall be published, and notice thereof brought home to the electors by mailing to them, as provided by law, a copy of the measure initiated or the act referended.

It is clear that § 61 relates to acts passed by the legislature only; of course, at the time § 61 was adopted, the initiative and referendum was not within the contemplation of the members of the constitutional convention.

Article 61 has no reference to the initiative and referendum; those subjects are fully provided for in article 26. It lays down the whole procedure for measures initiated by the people, or an act of the legislature referended by them, and it is self-executing.

Much stress is placed by respondents upon the decision of State ex rel. Standish v. Nomland, 3 N. D. 427, 44 Am. St. Rep. 572, 57 N. W. 85. That case construes § 61 of the Constitution. It does not, and manifestly could not, construe article 26, as that has been adopted at a very late date. That is a well-reasoned case, as applied to the construction of § 61. It has no application, however, in construing article 26, for article 26 is entirely different from § 61; and it may further be observed that article 26 is just as much a part of the Constitution as

§ 61, and it is just as much the duty of the court to give effect to the former as to the latter.

The case of Gottstein v. Lister, 88 Wash. 462, 153 Pac. 595, Ann. Cas. 1917D, 1008, cited by respondent, is subject to the same objection as State ex rel. Gibson v. Richardson, supra. Article 2 of § 1 of the Washington Constitution, prior to its amendment, was substantially the same as § 25 of our Constitution before its amendment by article 26.

Article 2 of § 1 of the Washington Constitution was amended, so as to reserve part of the legislative power to the people, by the process of initiative and referendum. An examination of the same, as amended, discloses the same condition as exists in the amendment to the Oregon Constitution, to which we have above referred; that is, there is no provision in it, as in ours, that, when a measure is initiated, or an act of the legislature referended, that the petition shall have printed thereon a ballot title, which shall fairly represent the subject-matter of the measure, etc.

Neither does it contain any provision for such extensive publicity as ours; for instance, the mailing of a copy of the initiated measure or referended act, to each voter, etc.

In the absence of providing for a ballot title, if an initiative measure, in the state of Washington were submitted or an act of the legislature were referended, and if the same were adopted by the people, at a proper election, and the constitutionality of such law was thereafter challenged, upon the ground that the title thereof embraced more than one subject, that question would likely have to be determined under § 19 of the Washington Constitution, which is as follows: "No bill shall embrace more than one subject, and that shall be expressed in the title." That provision is the same, in substance, as § 61 of our Constitution.

In other words, in amending article 2 of § 1 of the Constitution of Washington, no provision was made, such as is contained in article 26 of our Constitution, which provides for a ballot title, and determines what it shall contain, thus, clearly making § 61 inapplicable to our initiative and referendum.

The organic law, as contained in article 26, is the organic law in this state, by which the validity of the title of an initiative or referendum

act is determined, while that state is left, exclusively, to their § 19, to determine when the title to a bill is proper and constitutional, and that section when adopted, as our § 61, was intended to apply to acts of the legislatures, and not to the initiative and referendum; yet that state has no other provision to determine the constitutionality of a bill challenged, on the ground of failure of the title to comply with the requirement of the Constitution; and, hence, they determine the constitutionality of the initiative and referendum bills in that state, when challenged on the ground of no proper title, by their § 19, while in this state, under article 26, that subject is specifically taken care of, and it, as our organic law, governs and specifically states what must be in the title of an initiated measure or a referended act.

Both the state of Oregon and the state of Washington have statutory provisions regarding a ballot title for initiated measures and referended acts, as well as provisions for publicity, but they have no such provision in either of their Constitutions.

The act is next attacked on the ground that it is subversive of the so-called home-rule provisions of the Constitution, above mentioned. We think this contention cannot be sustained, and are further of the opinion that there is no contravention of the constitutional provisions relative to the authority conferred upon the county commissioners, to regulate the fiscal affairs of their county.

Section 170 of the Constitution relates to the management of the fiscal affairs of the county, by the chairman of the township boards thereof, when township organization has been adopted by a majority vote of the legal voters of the county voting at a general election. It contains other provisions not necessary to mention here.

Section 171 of the Constitution relates to the continuing of township organization, and provides that where such has been adopted, whether it shall continue, is a matter which may be submitted to the electors of a general election in the manner provided by law, and if a majority of all the votes cast upon such question shall be against said system of government, then the system of township organization shall cease, and the affairs of the county shall then be transacted by a board of county commissioners.

Section 172 is as follows: "Until the system of county government by the chairman of the several township boards is adopted by any coun-

ty the fiscal affairs of said county shall be transacted by a board of county commissioners. Said board shall consist of not less than three and not more than five members, whose terms of office shall be prescribed by law. Said board shall hold sessions for the transaction of county business as shall be provided by law."

Section 173 of the Constitution: "At the first general election held after the adoption of this Constitution, and every two years thereafter, there shall be elected in each organized county in the state, a county judge, clerk of court, register of deeds, county auditor, treasurer, sheriff and state's attorney, who shall be electors of the county in which they are elected, and who shall hold their offices until their successors are elected and qualified.

"The legislative assembly shall provide by law for such other county, township and district officers as may be deemed necessary, *and shall prescribe the duties and compensation of all county, township and district officers.*

"The sheriff and treasurer of any county shall not hold their respective offices for more than four years in succession."

In Funk & Wagnalls, New Standard Dictionary of the English Language, we find the following definition of the word fiscal: "Fiscal—is a financial secretary or minister." "Of or pertaining to treasury or public finances of a government; financial." "Fisc—a treasury of a kingdom or a state; money chest."

In the case of State ex rel. Wiles v. Heinrich, 11 N. D. 37, 88 N. W. 734, this court, speaking through Judge Young, said: "The board of county commissioners have the general superintendence of the fiscal affairs of the county and constitute a board of audit for all claims and demands against their counties, the amounts of which are not fixed by law."

This statement is principally based upon § 1907 of the Revised Codes of 1899, which is as follows: "Board to superintend fiscal affairs of county. It shall superintend the fiscal affairs of the county and secure their management in the best manner. It shall keep an account of the receipts and expenditures of the county and on the first Monday of July annually it shall cause a full and accurate statement of the assessments, receipts and expenditures of the preceding year to be made out in detail under separate heads with an account of all debts payable

to and by the county treasurer, and it shall have the same published in at least one newspaper in its county. If there is no newspaper in the county the same shall be posted up at the usual place of holding its sessions."

Section 1907 of 1899 Codes, in substance, and with an amendment with regard to the time and number of regular meetings of the board of county commissioners, is incorporated in § 3276, Comp. Laws 1913, which defines the duties of the board of county commissioners, with reference to fiscal affairs of the county.

At this point, it is well to note that § 172 of the Constitution names the fiscal affairs of the county as a subject-matter which shall be under the control of the board of county commissioners, while § 173 of the Constitution states that the legislative assembly shall prescribe the duties of the different county officers, and the officers of a subdivision of the county, such as township and district officers, etc. This would include county commissioners. Hence, the duties of the county commissioners with reference to the conduct of the financial affairs of their county are not defined nor set forth by the Constitution. It leaves that to be accomplished by legislation.

From what has been said, it must follow that the duties of the board of county commissioners are such as are defined and enacted by legislative enactment. Whatever powers they possess, with regard to conducting the fiscal affairs of their county, are derived from the authority of law enacted by the legislature, or the lawmaking power of the state.

The very power to designate official newspapers, and to publish their proceedings therein, is not a power possessed by them, by reason of any constitutional provision, or by any so-called home-rule provisions of the Constitution, but it is a duty imposed upon them by law, formerly by §§ 3307 and 3308, Comp. Laws 1913, and now by chap. 188.

It is self-evident that, if the legislature, and the people, by the initiative or referendum, have the sole power of defining, and by due enactment of law, saying what are the duties of the county commissioners, they have the power and authority to have those duties changed or to add new ones, or withdraw, discontinue, or take away a duty once granted to them; as, for instance, the repeal of §§ 3307 and 3308, by

the enactment of chap. 188, in so far as those sections conflict with the latter enactment.

This amounts to no more than a change in the manner of exercising a duty imposed upon the board of county commissioners, by the legislative power, and, it having the right to impose the duty, has the right to make the change, and the authority for doing so is found in § 173.

Chapter 188, in requiring all official publications and the publication of legal notices in one official newspaper of the county, to be designated by the state publication and printing commission, is based upon sound public policy.

It is a certain and direct means of affording residents of the county an opportunity to know of the publication, and gain knowledge of such matters. Even when §§ 3307 and 3308 were in full force, no publications were required to be made therein, excepting those which were official, such as the official proceedings of the board of county commissioners, etc. It contained no requirement, nor was there any other law requiring publication of legal notices to be made in the official papers.

The result was, as we all know, that in the publication of many legal notices, such as mortgage foreclosure, summons, etc., publication thereof was, designedly, often made in some newspaper in a distant part of the county from where the person entitled to have notice resided. This has often resulted in great loss of property and property rights to the debtor, or the one entitled to receive such notice.

To have one official newspaper in the county in which all legal and official publications must be made is, to a large extent, to eliminate the evil and injustice which too often resulted from permitting legal publications to be made in any newspaper in the county. For this reason, chap. 188 tends to preserve and protect property and property rights, and prevents them from being invaded or taken away, without notice or due process of law.

The respondents have invoked the protection of the 14th Amendment to the Federal Constitution. On this subject, it is only necessary to state that chap. 188 in no way contravenes that amendment.

Article 25 of the amendments to the Constitution amended § 89 thereof, so that amended it reads as follows: "The supreme court shall consist of five judges, a majority of whom shall be necessary to form a

quorum or pronounce a decision, but one or more of said judges may adjourn the court from day to day or to a day certain; provided, however, that in no case shall any legislative enactment or law of the state of North Dakota be declared unconstitutional unless at least four of the judges shall so decide."

The powers of the state government being distributed in three branches, the legislative, executive, and judicial, each of such branches are supreme while acting within their own sphere. Whatever enactments of law may be made by the legislative authority of the state is the law, subject only to the limitations that it must not contravene the provisions of the state or Federal Constitution.

These constitute the only grounds upon which the validity of a legislative act may be attacked, and these are the only grounds upon which the respondents may be heard to attack chap. 188.

In order for this court to declare chap. 188 unconstitutional, it would be necessary under the Constitution as amended, for four judges of this court to concur in the opinion, which would declare that law to be unconstitutional.

The order appealed from is reversed.

Neither party shall recover any costs.

ROBINSON, J., concurs.

ROBINSON, J. This is an appeal from an order sustaining a demurrer to the complaint which challenges the validity of the Printing Act (Laws 1919, chap. 188).

The act in question creates a commission and makes it the duty of the commission to designate in each county a newspaper which shall be the official newspaper of the county until its successor shall be chosen by vote, as provided by chap. 187, Laws 1919. This chapter does provide that "at the first general election . . . after the passage . . . of this act, and at the general election in each even-numbered year, . . . the legal voters in each . . . county . . . shall be entitled to vote for such newspaper in said county as such voter desires to be selected as the official newspaper." Thus it appears the power given the printing commission to designate a newspaper is merely a temporary expedient; it continues only until the voters have a chance to ex-

press their choice. That effectually knocks out all the little merit there may be on the home-rule objection.

The statute was passed by nearly a two-thirds majority in each house. The yeas and nays were entered on the journal. Then a referendum was filed against this and six other acts, which were all duly submitted to the voters at a special election. The submission was pursuant to this constitutional amendment: "The secretary of state shall cause to be printed and mailed to each elector a publicity pamphlet containing each measure, together with its ballot title, to be submitted at any election."

The publicity pamphlet mailed to each registered voter contains a copy of the act, its title, its ballot title, with the arguments for and against it, and in the newspapers the act in question was probably discussed more than any other measure ever submitted to the voters, because so many papers were opposed to it. The result was that nearly 112,000 votes were cast for or against the act, and it was approved by a large majority vote. Hence it has been doubly passed and approved. As the history of the act clearly shows, no one was misled or deceived by reason of any defect in its title. It was passed at the same time as chap. 187, entitled: "An Act Providing for the Selection of One State, County, and Municipal Newspaper in Each County, Prescribing the Manner of Its Selection and Duties." To that title and to chap. 187 there is no objection. The title to chap. 188 is very short. It is, in effect: An Act Relating to the Publication and Printing of Legal Notices; or, an Act Concerning a State Publication and Printing Commission and Prescribing Its Duties. The name of the commission does, to some extent, indicate the line of its duties. It is a commission in regard to printing and publication, and of course it must relate to legal notices and documents, and not to private matters. The title of the act is merely a suggestive name by which it may be called and known. It never should attempt to give the details of the act; it never should exceed two or three lines.

When any measure is submitted to the voters the official ballot contains a short ballot title, thus (S. B. 157—State Publishing and Printing Commission) the regular title of the bill, and the bill itself—and that is all. And when that is shown there is no reason for any deception. The vote on the bill was: Yes, 59,364; No, 52,450. There can

45 N. D.—20.

be no just claim that the lawmakers or any voter was misled or deceived, or that the procedure was in any manner deceptive. In the pamphlet mailed to each voter there is a long argument against the bill under this heading: "State Publication and Printing Commission Law—Senate Bill No. 157." But there is not a word of opposition to the title or the manner in which the bill was passed by the legislative assembly. Indeed, such objections would have been trivial and futile. The bill itself was before the voters in plain English, and it was for them to vote yes or no.

Section 61 of the Constitution, relating to the title of a bill, was passed as a direction or mandate to the legislative assembly. It has been liberally construed. It is held as a limitation to prevent deception and incongruous legislation. However, there is no reason why it should apply to an act or a measure submitted to the people, who have power to amend, make, and unmake their Constitution. The purpose of the Constitution was not to place a limitation on the people themselves, but on those to whom they have delegated certain powers, so as to prevent an abuse of the powers.

The rule is that every act passed by one legislative assembly may be repealed or amended by the next legislative assembly; but that rule does not apply to any measure submitted to and approved by the people. It may not be amended or repealed, except by a two-third majority of all the members elected to each house. It is, in effect, a constitutional amendment, and as such it should be respected by the courts. Nothing would seem more grossly absurd than for the court, on a trivial objection to a matter of procedure, to hold void an act approved by nearly two thirds of the lawmakers, and then by a great majority of the voters.

A recent amendment to the Constitution indicates the people have come to learn that judges are not infallible, and it is well to limit the power to annul even an act of the legislative assembly. It is provided: The supreme court shall consist of five judges, and no legislative enactment shall be held void unless at least four of the judges so decide. To this there might well have been added that no measure submitted to and approved by the people shall be held void by any court. The power which courts have assumed, by a bare majority of one, to hold void acts of Congress and legislative enactments, may soon be a thing of the

past. If the court have the power, by any majority, to hold void an act submitted to and approved by the people, the power is too dangerous and arrogant for use, except on occasions very extraordinary. The order appealed from is reserved.

BRONSON, J., being disqualified, did not participate.

BIRDZELL, J. I concur in the judgment of this court reversing the order appealed from, though I respectfully disagree with the holding of my brethren, Justices Robinson and Grace, on the basic propositions that the title to the act is good, and that its purpose was not changed during passage. I agree that the act does not violate any provision of the Federal Constitution. This seems to me to be so clear that a statement of reasons is unnecessary.

I am constrained to concur in the order of reversal, by reason of the provisions of the amendment to § 89 of the Constitution, which states that no act of the legislative assembly may be declared unconstitutional by the supreme court unless by the vote of four of the five judges. There is no way to give effect to this constitutional provision unless the members of this court respect it as a part of the fundamental law by directing a judgment to be entered in individual cases which may not conform to their views as to what the judgment should be. Entertaining this opinion, I deem it my duty to vote for a reversal of the order, though disagreeing with two of my associates who have expressed the opinion that the title to the act is sufficient within § 61 of the Constitution, and that the purpose was not changed in violation of § 58. If these two sections of the Constitution were not violated, as is held by Justices Robinson and Grace, the act is clearly constitutional, regardless of the effect of the approval at the referendum election. So far as the disposition of this case is concerned, therefore, the individual views of the members of the court upon other questions which are not decisive would seem to be obiter. And the fact that other questions have been argued and discussed does not alter the situation.

I agree with that portion of the opinion of Chief Justice Christianson, in which the reasons are stated for the conclusion that the title to the act in question was not sufficient and that its purpose was changed during passage. Further than this, my opinion is reserved on all con-

stitutional questions presented, for the reason that they are not decisive of the case.

CHRISTIANSON, Ch. J.   The sole question involved in this case is the constitutionality of chap. 188, Laws 1919.   The respondents contend that the statute violates the 14th Amendment to the Federal Constitution; and, among others, §§ 58 and 61 of the state Constitution. Mr. Justice Bronson deemed himself to be disqualified and has taken no part in the consideration of the case.   Two different district judges successively called in to sit in his place, also deemed themselves to be disqualified.   Inasmuch as all members of the court were of the opinion that the act does not contravene the 14th Amendment; and inasmuch as two members of the court—Justices Grace and Robinson,—declared themselves to be of the opinion that the act does not contravene any provision of the state Constitution, no other district judge was called in to sit in the place of Mr. Justice Bronson, for under our Constitution the vote of Justices Grace and Robinson is decisive of the constitutional question.   Our Constitution provides:   "That in no case shall any legislative enactment or law of the state of North Dakota be declared unconstitutional unless at least four of the judges of the supreme court so decide."   Const. § 89, as amended.   While I agree that the votes of Justices Grace and Robinson are decisive of the case, I do not agree that the statute under consideration does not contravene §§ 58 and 61 of the state Constitution.   On the contrary I am firmly of the opinion that it violates both of these sections.   And inasmuch as Justices Grace and Robinson have filed opinions setting forth at some length the reasons why they are of the opinion that the statute does not violate these constitutional provisions, I deem it proper to indicate the reasons why I am of the opinion that it does.

If I correctly read the opinions prepared by Justices Grace and Robinson they are to the effect:

1. That the legislature, in the enactment of the statute under consideration, did not violate, and that the statute does not contravene, either § 58 or § 61; and,

2. That even though the statute as enacted contravened these sections, it became validated by reason of its approval at a referendum election.   I do not believe that either contention is correct.

The statute in question was introduced as Senate Bill No. 157, on February 4, 1919. During the course of its passage it was amended. In order to visualize the changes made by such amendments, I set forth in parallel columns the bill as introduced, and as finally enacted and approved.

| As Introduced. | As Enacted. |
|---|---|
| A Bill for an Act Creating a State Publication and Printing Commission; Prescribing Its Duties and Powers; and Repealing all Acts and Parts of Acts Conflicting Herewith. | An Act Creating a State Publication and Printing Commission; Prescribing Its Duties and Powers; and Repealing All Acts and Parts of Acts in Conflict Herewith. |
| Be it enacted by the legislative assembly of the state of North Dakota: | Be it enacted by the legislative assembly of the state of North Dakota: |
| Section 1. In lieu of the commissioners of public printing, there is hereby created a Commission to be known as the State Publication and Printing Commission. | Section 1. In lieu of the commissioners of public printing, there is hereby created a Commission to be known as the State Publication and Printing Commission. |
| Section 2. The said commission shall be composed of the state treasurer, attorney general, and the secretary of state; and shall hold their first meeting in the office of the secretary of state within twenty days after the passage and approval of this act. | Section 2. The said commission shall be composed of the secretary of state, the commissioner of agriculture and labor, and the chairman of the board of railroad commissioners. It shall hold its first meeting in the office of the secretary of state within twenty days after the passage and approval of this act. |
| Section 3. The said commission is authorized to appoint a state printer, who shall also be secretary to the commission, and such appointee may, by the commission be removed with or without cause. The person so appointed must at the time of his appointment be a legal resident of the state of North Dakota for at least one year last past, and be a practical expert printer, and shall receive an annual salary of twenty-four hundred ($2,400) dollars; he shall perform all the duties now required by law for the expert printer and such other duties as may be assigned to him | Section 3. The said commission is authorized to appoint a state printer, who shall also be secretary to the commission, and such appointee may, by the commission, be removed with or without cause. The person so appointed must at the time of his appointment have been a resident of the state of North Dakota for at least one year last past, and must be a practical expert printer. He shall receive an annual salary of twenty-four hundred ($2,400) dollars; he shall perform all the duties now required of the expert printer, and such other duties as may be assigned to him |

by the commission hereby established, and shall hold his office in the state capitol.

Section 4. In addition to all the duties and powers now vested by law in the board heretofore known as the Commissioners of Public Printing, the commission shall have power to make all printing contracts in all matters of state printing to be done for or by the state or any of its departments.

by the commission hereby established, and shall maintain his office in the state capitol.

Section 4. In addition to the duties and powers now vested by law in the board heretofore known as the Commissioners of Public Printing, the Commission shall have the power to make all printing contracts in all matters of state printing, and the power to designate a newspaper in every county in the state, and a newspaper or newspapers in the state, in which publications required by law to be published by state officials, must be made. It shall be the duty of said commission to designate in every county of this state a newspaper, which shall be the official newspaper in each county in which it is designated, until its successors shall be chosen as provided by law; and in said newspapers in each county as designated, shall be published official proceedings of the board of county commissioners in each county respectively, and all other notices and publications that are now required by law to be published by county officers in the several counties; all summons, citations, notices, orders and other processes in all actions and proceedings in the supreme, district or county or justice courts, which are or may be hereafter required by law to be published in the respective counties of the state; all publications of every nature that are now or may hereafter be required to be published by state officers; all notices of foreclosure by advertisement or real estate or chattel mortgages or of other liens on real or personal property; all notices of whatsoever kind and character now or hereafter required by law to be published, in said county; provided, however, that in organized cities, town or villages, where no official newspaper is published, said city, town or village, council, com-

mission or board, may designate an official newspaper for the publication of such notices and legal publications as are now or may hereafter be required by law for said cities, towns or villages, including legal notices and official statements of the schools within such cities, towns and villages, and the statements of banks and other corporations therein; but in cities, towns or villages where the commission designates an official newspaper, such notices and legal publications as are now required by law to be published by cities, towns or villages, shall be published in the official newspaper designated by the commission. The commission shall have the power and it shall be its duty to select one or more legal newspapers in this state for the publication of all state legal notices, including notices for the publication of any reports of corporations doing business in this state, now required by law to be published, either from the office of the insurance commissioner or secretary of state or other state officers, and it shall have the power, in addition to the provisions of law now existing, to make contracts with any printer, newspaper publisher, person or corporation, for the publication of any state legal notice, for the printing of the state documents, laws, journals or other state matters, or for the making or providing of state stationery, of blanks and other documents whatsoever in their judgment they may determine so to do. It shall be the duty of every newspaper in this state thus designated by the commission to send to the secretary of such commission, at Bismarck, weekly, two copies of every issue published by it, and the secretary shall keep on file in his office in the state capitol a complete file of every such newspaper, and shall furnish to any person certified copies of matter contained in any of such papers, upon

the payment by such person of the sum of 10 cents per folio for each copy so furnished by him; the fee for such certified copies shall be turned over to the state treasurer on the first business day of each month.

Section 5. The legislative intent of this act is to co-ordinate the publication of all state printing for all state departments under the control of one body.

Section 5. The intent of this act is to co-ordinate publication of all state legal notices, publications, reports and laws of every kind and nature under one supervising head, to have definite and certain legal newspapers in this state, so that information can be readily secured concerning any legal publication, and to economize in the matter of state printing; and to keep a complete system of files where legal publications of every kind in this state can be readily found. This act shall receive a liberal construction in order to effectuate the purposes and intent thereof.

Section 6. All acts and parts of acts in conflict with this act are hereby repealed.

Section 6. All acts and parts of acts in conflict with this act are hereby repealed.

Section 7. An emergency is hereby declared to exist, therefore, this act shall take effect and be in force from and after its passage and approval.

Sections 58 and 61 of the state Constitution read as follows:

"No law shall be passed except by a bill adopted by both houses, and no bill shall be so altered and amended in its passage through either house as to change its original purpose." § 58.

"No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed." § 61.

That the courts possess the same power to expound and apply, and that it is their sworn duty to enforce, these provisions, the same as other constitutional provisions, is beyond question. Lewis's Sutherland, Stat. Constr. § 114; Cooley, Const. Lim. 7th ed. pp. 202–214;

25 R. C. L. p. 836. See also State ex rel. Standish v. Nomland, 3 N. D. 427, 44 Am. St. Rep. 572, 57 N. W. 85; Richard v. Stark County, 8 N. D. 392, 79 N. W. 863. This is especially true under our Constitution, which expressly declares that its provisions "are mandatory and prohibitory unless, by express words, they are declared to be otherwise." Const. § 21; Ex parte Liddell, 93 Cal. 633, 29 Pac. 251. And § 61, supra, clearly contemplates that the courts shall enforce it and hold invalid statutory provisions violative thereof; it expressly provides that "a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed" in its title.

The two sections of the Constitution are framed in the plainest terms. There is no room for difference of opinion as to what the language employed means. "Words or terms used in a constitution, being dependent on ratification by the people, must be understood in a sense most obvious to the common understanding at the time of its adoption." 6 R. C. L. p. 52. This has repeatedly been emphasized by the greatest authorities on constitutional law.

Judge Marshall said: "The framers of the Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." Gibbons v. Ogden, 9 Wheat. 1, 188, 6 L. ed. 23, 68.

Judge Cooley said: "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." Cooley, Const. Lim. 7th ed. 93.

Judge Story said: "Constitutions are not designed for metaphysical or logical subleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." Story, Const. § 454.

Sections 58 and 61 of the Constitution run along similar lines. Both were designed to prevent certain pernicious practices which experience had taught would spring up where such provisions did not exist. They were placed in the Constitution to insure better legislation.

In considering a constitutional provision similar to § 61, the supreme court of Michigan, speaking through the great jurist, Cooley, J., said: "The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their nature and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state. It was scarcely more so, however, than another practice, also intended to be remedied by this provision, by which, through dexterous management, clauses were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. There was no design by this clause to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, and thus multiplying their number; but the framers of the Constitution meant to put an end to legislation of the vicious character referred to, which was little less than a fraud upon the public, and to require that in every case the proposed measure should stand upon its own merits, and that the legislature should be fairly notified of its design when required to pass upon it." People ex rel. Drake v. Mahaney, 13 Mich. 481.

The court of appeals of New York declared the object of this provision to be "that neither the members of the legislature nor the people should be misled by the title." Sun Mut. Ins. Co. v. New York, 8 N. Y. 239. The supreme court of Iowa said: "The intent of this provision of the Constitution was to prevent the union in the same act, of incongruous matter and of objects having no connection, no relation. And with this it was designed to prevent surprise in legislation, by having matter of one nature embraced in a bill whose title expressed another." State ex rel. Weir v. County Judge, 2 Iowa, 280.

Ruling Case Law says: "The mischief sought to be remedied by the

requirement of a single subject or object of legislation was the practice of bringing together in one bill matters having no necessary or proper connection with each other, but often entirely unrelated and even incongruous. By the practice of incorporating in proposed legislation of a meritorious character provisions not deserving of general favor, but which, standing alone and on their own merits, were likely to be rejected, measures which could not have been carried without such a device and which were sometimes of a pernicious character were often incorporated in the laws; for, to secure needed and desirable legislation, members of the legislature were, by this means, often induced to sanction and actually vote for provisions which, if presented as independent subjects of legislation, would not have received their support. It was also the practice to include in the same bill wholly unrelated provisions, with the view of combining in favor of the bill the supporters of each, and thus securing the passage of several measures, no one of which could succeed on its own merits. To do away with this hodgepodge or 'logrolling' legislation was one, and perhaps the primary, object of these constitutional provisions. Another abuse that developed in legislative bodies was the practice of enacting laws under false and misleading titles, thereby concealing from the members of the legislature, and from the people, the true nature of the laws so enacted. It is to prevent surreptitious legislation in this manner that the subject or object of a law is required to be stated in the title. While the objects of these constitutional provisions are variously stated, the authorities are agreed that they were adopted to remedy these and similar abuses. The purpose of these constitutional provisions has been summarized as follows: (1) To prevent 'logrolling' legislation; (2) to prevent surprise or fraud in the legislature, by means of provisions in bills of which the titles give no intimation; and (3) to apprise the people of the subject of legislation under consideration." 25 R. C. L. § 83, pp. 834–836. Section 58, supra, in express terms says that "no bill shall be so altered and amended on its passage through either house as to change its original purpose." Language could be no plainer. It interprets itself. There is no room for construction. The only difference of opinion that can reasonably arise is as to whether a certain alteration or amendment changes the original purpose of the bill.

Section 61 provides that an "act shall contain but one subject, but

that that shall be expressed in the title. The title thus made a part of an act must agree with it by expressing its subject. The title will fix bounds to the purview, for it cannot exceed the title subject, nor be contrary to it. . . . It is not enough that the act embraces but a single subject or object, and that all its parts are germane. The title must express that subject, and comprehensively enough to include all of the provisions in the body of the act." State ex rel. Standish v. Nomland, 3 N. D. 427, 432, 44 Am. St. Rep. 572, 57 N. W. 85; Lewis's Sutherland, Stat. Constr. § 87. The provision "may be violated in two ways: First. The act must not embrace more than one subject. If it embraces two subjects, and both are fully expressed in the title, still the provision is clearly violated. Black, Const. Law, 288; Cooley, Const. Law, 178. Second. If it embraces but one subject, and that subject be not expressed in the title, the provision is equally violated. This is the clear language of the provision. 'But if the act relates to one subject-matter, which is properly expressed in the title, and also embraces provisions not related to such subject, which are not mentioned in the title, then the foreign or unrelated matters will be separated from the rest of the statute, if possible, and rejected, while the main body of the act will be sustained.' People ex rel. Rochester v. Briggs, 50 N. Y. 553; Cooley, Const. Law, 148." Richards v. Stark County, 8 N. D. 392, 393, 79 N. W. 863.

In the court below and in this court respondents contended:

1. That the matter inserted in Senate Bill No. 157, relating to the designation of newspapers in which all official and legal notices must be published, was variant from and changed the original purpose of the bill.

2. That the title of the act did not express the subject relating to the designation of such newspapers,—i. e., that the title is not broad enough to cover the designation, by the commission, of newspapers in the various counties of the state in which official notices of counties and municipalities, and legal notices of private parties, must be published.

3. That the act embraces more than one subject.

During the entire history of the state there has been a state printing commission. It will be noted that § 1 of the act under consideration recognizes the existence of such commission. The state printing com-

mission was established by a law enacted by the first legislative assembly of the state. See Laws 1890, chap. 119; Comp. Laws 1913, § 45. The commission so created consisted of the secretary of state, state treasurer, and state auditor. Such commission was required to advertise for bids for the printing of the state, and authorized to contract with the lowest bidder for the different classes of printing. Laws 1890, chap. 119; Comp. Laws 1913, §§ 47–51. The act consisted of thirty-six sections. It classified the state printing, and contained full and explicit particulars as to everything relating to state printing, and the duties of the commissioners in regard thereto. Later, provision was made for the employment by the commissioners of public printing of an expert to assist them in the performance of their duties. Rev. Codes 1895, Comp. Laws 1913, § 56.

It appears that the printing for the various educational institutions, as well as some of the printing for the state superintendent of public instruction, was not included in the printing to be contracted for by the commissioners of public printing. At least the laws had been construed as vesting in the boards in charge of the educational institutions the power to contract for the printing to be done for such institutions, and as authorizing the state superintendent of public instruction to contract for some of the printing for his department. See Report of Attorney General for 1915–1916, p. 236. The obvious purpose of Senate Bill No. 157 (as introduced) was to change the personnel of the commission having charge of the state printing, and to confer upon the commission as recreated the functions exercised by the former commission, and bring all kinds of printing for the various state departments under its jurisdiction. It will be noted that no attempt was made (either in the bill as introduced or as enacted) to legislate with reference to all the matters covered by the former law, such as the classification of printing, advertisement for bids, etc. It was apparently the intention that the provisions of the former law should remain in full force and effect as to such matters. In the bill as introduced, the legislature declared the intent to be "to co-ordinate the publication of all state printing for all state departments under the control of one body." Anyone reading the title, and the bill as originally introduced, would have no question as to its purpose.

It will be noted that by the amendment inserted in § 4, the Com-

mission was granted power "to designate in every county of this state a newspaper, which shall be the official newspaper. . . . And in said newspapers in each county as designated, shall be published official proceedings of the board of county commissioners in each county respectively and all other notices and publications that are now required by law to be published by county officers in the several counties, all summons, citations, notices, orders and other processes in all actions or proceedings in the supreme, district or county or justice courts; . . . all notices of foreclosure by advertisement of real estate or chattel notices or of other liens on real or personal property; all notices of whatsoever kind and character now or hereafter required by law to be published." It is further provided that "in cities, towns or villages where the commission designates an official newspaper, such notices and legal publications as are now required by law . . . shall be published in the official newspaper designated by the commission." The publication of such various notices and statements was fully provided for under the former laws. Under the then existing laws, it was the duty of the county commissioners to designate the official newspapers of the counties and the duty of the proper city authorities to designate the official newspaper of the city. That had been the settled law during the entire history of the state. Provision had also been made for the proper qualification of legal newspapers. And legal notices in private matters, such as summonses, citations, foreclosure notices, etc., might be published in any properly qualified newspaper. The amendment in effect repeals or amends all these various statutory provisions.

And, as was said by the supreme court of Michigan, in considering a somewhat similar proposition: "If this legislation can be upheld it would seem that the constitutional provision above quoted is worthless to prevent the evil against which it is manifestly directed." If the constitutional provision is in the way of legislation, and the people desire that a bill may be so altered or amended during the course of its passage in the legislature that it be eliminated from the Constitution, "there is a constitutional way to get rid of this provision. But it is the duty of the courts, while it remains in the Constitution, to see that it is obeyed." Sackrider v. Saginaw County, 79 Mich. 59, 44 N. W. 165. See also Re House Bill No. 231, 9 Colo. 624, 21 Pac.

472; Re House Bill No. 250, 26 Colo. 234, 57 Pac. 49; Weis v. Ashley, 59 Neb. 494, 80 Am. St. Rep. 704, 81 N. W. 318; Pottawatomie County v. Alexander, — Okla. —, 172 Pac. 436; State v. Chong Ben, 89 Or. 313, 173 Pac. 259, 1173.

Will anyone seriously contend that the publication of proceedings of boards of county commissioners, and of notices of foreclosure sale, summonses, and citations; or the designation of newspapers in which such statements and notices must be published,—was within the "original purpose" of the bill. The question seems too plain for controversy. A comparison of the original bill with the one enacted demonstrates beyond cavil that the matters inserted in § 4 during the course of the passage was wholly foreign to the original purpose of the bill. If § 58 of the Constitution can ever be violated by inserting matter in a bill during the course of its passage, which is foreign to and changes the original purpose thereof, it certain has been violated in this case. While many cases have been cited wherein statutes were held unconstitutional as violative of similar constitutional provisions, in no one was the violation of the provision so palpable as in this case.

It seems equally clear that the matter inserted in the act by the amendments is not expressed in the title. It will be noted that the statute is entitled, "An Act Creating a State Printing and Publication Commission; Prescribing Its Duties and Powers; and Repealing All Acts and Parts of Acts Conflicting Herewith."

Under § 61, supra, "the title of an act defines its scope; it can contain no valid provision beyond the range of the subject there stated." Lewis's Sutherland, Stat. Constr. § 145. But provisions germane to the subject expressed, or which may aid the accomplishment of the purpose expressed in the title, may be included, and will be deemed covered by the title. As was said by the supreme court of Wisconsin: "When one reading a bill, with the full scope of the title thereof in mind, comes upon provisions which he could not reasonably have anticipated because of their being in no way suggested by the title in any reasonable view of it, they are not constitutionally covered thereby. But in applying that rule, this other rule, which has been universally adopted, must be kept in mind. The statement of a subject includes, by reasonable inference, all those things which will or may facilitate the accomplishment thereof." Diana Shooting Club v. Lamoreux, 114

Wis. 44, 50, 91 Am. St. Rep. 898, 89 N. W. 880. Would anyone expect to find in an act entitled as the one under consideration anything in regard to the newspapers in which official proceedings and notices of counties and cities must be published? Would anyone about to foreclose a mortgage or probate an estate have the slightest reason to apprehend that a law entitled as the one before us actually changed the established law of the state with respect to the newspapers in which foreclosure notices and citations in probate proceedings must be published? It seems to me that reasonable men can make but one answer to these questions.

Section 61 of the Constitution was construed and applied in the early history of this state. In State ex rel. Standish v. Nomland, 3 N. D. 427, 44 Am. St. Rep. 572, 57 N. W. 85, the section was applied to an act entitled "An Act Creating the Office of the State Board of Auditors and Prescribing the Duties Thereof." The act provided that the board of auditors should designate state depositaries, in which the state treasurer should deposit the funds of the state. The court held that the subject of the act was not sufficiently expressed in the title. In the decision in that case this court said: "This court should be careful to destroy no legislation sanctioned by the lawmaking branch of the state government, unless such legislation be a clear violation of the constitutional requirement. But we have no duty higher or more sacred than is the duty to preserve, in all its integrity, every provision in the fundamental law of the state. The provisions of our state Constitution are, by the terms of the instrument itself, declared to be mandatory,—mandatory alike upon the legislature and upon this court. If the legislature in any act disregarded the mandate, it is the duty of this court to nullify the act, and the fact that the abortive legislation may be highly beneficial and salutory in its nature can, in no manner, control that duty. Our constitutional provision is clear, direct, and positive. 'No bill shall embrace more than one subject, which shall be expressed in its title.' What was the subject of the bill in this case? In § 85, Sutherland Stat. Constr. it is said: 'It is a matter of some difficulty, in many instances, to determine precisely what is the subject of an act, by reason of the contrariety of its provisions and the complexity of its machinery and aims.' The language is not inappropriate here. Generally speaking, the subject was the state funds; more speci-

fically it was the security and augmentation of those funds; but neither generally nor specifically is the subject expressed in the title,—'An Act Creating the Office of the Board of State Auditors and Prescribing the Duties Thereof.' Was the act passed for the purpose of creating that board? Was that the subject—the object—of the act? Clearly not. The board was simply an instrumentality for the accomplishment of some purpose, but what purpose no human foresight could determine from that title. Following that title, the legislature might, with equal propriety, have passed an act relating to any subject upon which the legislature could constitutionally authorize a board to act. We have held that, when the subject of the act was properly expressed in its title, the act might create the means and instrumentalities required for its own accomplishment (State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 11 L.R.A. 420, 46 N. W. 970; State v. Hass, 2 N. D. 202, 50 N. W. 254), but it has never been held, under this provision, that where the title announced only the instrumentality, the act itself might announce the subject upon which the instrumentality was expected to operate. Were we disposed to be critical, we might say the title in this case does not even say that much, for it announced but one of several instrumentalities. The action of the governor and state treasurer is just as essential for the accomplishment of the purpose of the act as the action of the board. 'It is required that an act shall contain but one subject, but that that be expressed in the title. The title thus made a part of an act must agree with it by expressing its subject. The title will fix bounds to the purview, for it cannot exceed the title subject, nor be contrary to it. . . . It is not enough that the act embraces but a single subject or object, and that all its parts are germane. The title must express that subject, and comprehensively enough to include all of the provisions in the body of the act.' Sutherland Stat. Constr. § 87. A single glance discovers that the title in this case meets no single requirement there specified."

The language and reasoning in State ex rel. Standish v. Nomland, supra, is directly applicable in this case. The title to the act here in question is in effect like that involved in the Nomland Case, for of course all new legislation repeals previous acts relating to the same subject, and wholly in conflict with the new legislation. Here—as in the Nomland Case—the title stated that the act created a certain board

45 N. D.—21.

or commission and prescribed its duties. The following observation by the court in the Nomland Case is equally pertinent here: "Was the act passed for the purpose of creating that board? Was that the subject—the object—of the act? Clearly not. The board was simply an instrumentality for the accomplishment of some purpose, but what purpose no human foresight could determine from that title. Following that title, the legislature might, with equal propriety, have passed an act relating to any subject upon which the legislature could constitutionally authorize a board to act."

Clearly the designation of official or legal newspapers is not covered,—or germane to the subject covered—by the title. In fact this was at least impliedly recognized by the legislature which enacted the statute under consideration. The same legislature also enacted an act entitled "An Act Providing for the Selection of One State, County and Municipal Newspaper in Each County, Prescribing the Manner of Its Selection and Duties." Laws 1919, chap. 187. The act so entitled provided that, at the next general election held throughout the state, an official newspaper should be selected by the voters in each organized county in the state, in which all legal notices and official statements and advertisements should be published. (The language relating to the notices to be so published is identical with that already quoted, which was inserted in Senate Bill No. 157 by amendment during the course of its passage.) This title of chap. 187 indicated that the purpose of the act was to provide for the selection of a newspaper "in each county" to prescribe "the manner of its selection," and to prescribe the duties of such newspaper. The purpose of the act was as stated in the title. Yet, Senate Bill No. 157 purports to legislate upon every matter covered by chap. 187, Laws 1919,—it provides for the selection of a newspaper in each county, prescribes the manner of its election, and the duties of such newspaper. Compare the titles of the two acts:

"An Act Creating a State Publication and Printing Commission; Prescribing Its Duties and Powers; and Repealing All Acts and Parts of Acts in Conflict Herewith." Laws 1919, chap. 188.

"An Act Providing for the Selection . . . of One State, County and Municipal . . . Newspaper in Each County, . . . Prescribing the Manner of Its Selection and Duties." Laws 1919, chap. 187.

Can it be said that the title of chap. 188 covers the subject stated in the title of chap. 187? It seems to me that there is no room for a difference of opinion as to how this question should be answered.

But it is contended that §§ 58 and 61 of the Constitution are inapplicable to laws which have been submitted and approved at a referendum election. It is even suggested that an act so approved "is, in effect, a constitutional amendment." This suggestion ignores the fact that a different method is provided for the submission of constitutional amendments, whether proposed by initiative petition or by the legislative assembly, from that provided for the submission of a statute pursuant to a referendum petition.

But even a constitutional amendment does not become effective unless it has been adopted in accordance with the provisions of the existing Constitution. 6 R. C. L. p. 31. And "it is the duty of the courts to enforce provisions of an existing Constitution in reference to matters connected with proposed changes in the Constitution as in other cases." 6 R. C. L. p. 32. See also 6 R. C. L. p. 72. Such rule is established by the overwhelming weight of judicial authority, and has been recognized by this court. In State ex rel. Fargo v. Wetz, 40 N. D. 299, 5 A.L.R. 731, 168 N. W. 835, 846, this court, speaking through Mr. Justice Birdzell, said: "If the [constitutional] amendment were not properly submitted, it would unquestionably be the duty of the court to declare it not a part of the Constitution. The provisions of our Constitution are mandatory and prohibitory (§ 21), and, as such, the Constitution construes itself in relation of such a matter as that under discussion. State ex rel. Woods v. Tooker, 15 Mont. 8, 25 L.R.A. 560, 37 Pac. 840. Thus, when the Constitution says that 'amendments shall be submitted . . . in such a manner that the electors shall vote for or against each . . . separately' [§ 202] the failure of the proper officials to comply with the direction is necessarily fatal to the attempted amendment. It is the duty of the court to uphold and give effect to every part of the Constitution, and this provision can only be enforced by refusing to recognize as an amendment that which was never legally adopted as such. That this duty has been fully and faithfully discharged by the courts in the past is indicated by the statement of Dodd. After an exhaustive consideration of the experiences of the various states in the submission and adoption of con-

stitutional amendments, he says: 'If a required step is omitted, or is not even in substance complied with, no court has ever upheld the amendment, even though it may have been approved by the people; that is, the constitutional requirements are mandatory, not merely directory, and no court will overlook the entire disregard of even the less important of such requirements. Dodd, Revision & Amendment of State Const. pp. 217, 218."

In the main, the general principles governing the construction of statutes apply also to the construction of constitutions. Constitutional provisions, however, are intended to establish the frame work and general principles of the government, and it is presumed that they have been more carefully and deliberately framed than is the case with statutes. The fundamental purpose of construction as applied to constitutional provisions is to ascertain and give effect to the intent of the framers and of the people who adopted them. Therefore, in construing a constitutional provision, the court should constantly keep in mind the object sought to be accomplished by the adoption thereof. It is an elementary rule of construction, applicable alike to the statutes and constitutional provisions, that repeals by implication are not favored. It is presumed that all laws are passed, and all constitutional amendments adopted, with a knowledge of those already existing, and that there was no intention to repeal existing provisions without so declaring. "The intention to repeal will not be presumed nor the effect of repeal admitted unless the inconsistency is unavoidable and only to the extent of repugnance." A later and an older provision will, and if is possible and reasonable to do so, be always construed together so as to give effect, not only to the distinct parts or provisions of the latter, not inconsistent with the new law, but to give effect to the older law as a whole, subject only to restrictions or modification of its meanings, when such seems to have been the purpose of the new law. It is the duty of the court to so construe the laws, if possible, that both shall be operative. "There must be such a manifest and total repugnance that the two enactments cannot stand." "One provision is not repugnant to another unless they relate to the same subject and are enacted for the same purpose." Lewis's Sutherland, Stat. Constr. 2d ed. § 247. "An implied repeal on the ground of repugnancy will not result in any case unless both the object and the subject of the statutes

are the same; and if their objects are different both statutes will stand, though both relate to the same subject, because in such case the conflict is apparent only and when the language . . . is restricted to its own object the two will run in parallel lines without meeting." 26 Am. & Eng. Enc. Law, 2d ed. p. 727.

Surely there is no irreconcilable conflict between §§ 58 and 61 of the Constitution and the provisions reserving, and providing for the exercise of, the power of referendum. There is no reason why they may not be read together, and each and all given full effect.

The purpose of the referendum is well known. The power is reserved primarily to enable the people to reject legislation which they deem to be undesirable. It is invoked by those who are dissatisfied with and seek to bring about the defeat of some legislative enactment, and not by those who seek to secure approval thereof. It has never been contended or supposed that the referendum power was reserved for the purpose of having questions relating to the constitutionality of laws submitted to and passed upon at a referendum election. On the contrary, it has been held that constitutional provisions like §§ 58 and 61, supra, are as applicable to statutes submitted to a popular vote as to those which become operative without such vote. Ruling Case Law, says: "It has been contended that there is some difference in the rule [as to the applicability of constitutional provisions like § 61] between an act which is submitted to popular vote and one which becomes operative without such vote. But there is no reason or foundation for such a distinction. Presumably a motive which would influence a legislator in voting for the act would equally influence an elector, and a title which would direct the mind of a legislator to the general subject of an act would fairly direct the mind of the voter to the same subject." 25 R. C. L. p. 839. See also State ex rel. Gibson v. Richardson, 48 Or. 309, 8 L.R.A.(N.S.) 362, 85 Pac. 225.

In this connection it is well to bear in mind the reason for the rule announced in § 61 of the Constitution. As has been indicated, the purpose of § 61 was to restrict each legislative measure to one "subject" to the end that "logrolling" legislation might never be enacted in this state. It was intended to compel each "subject" of legislation to stand upon its own merits; to afford each legislator an apportunity to vote for or against any question affecting one subject, separately and

independently from his vote for or against any question relating to any other subject, and to prevent the practice of incorporating in proposed meritorious legislation, provisions having no necessary or proper connection therewith, and which provisions might have failed if presented as individual measures. Manifestly the reason for the rule announced in § 61 is as applicable to voters as to legislators, and there is no good reason why the section should not apply as well to measures or propositions submitted to the people as to those submitted to the legislators.

On the contrary the principle embodied in § 61 of the Constitution is generally deemed applicable to propositions submitted at elections. In Stern v. Fargo, 18 N. D. 289, 26 L.R.A.(N.S.) 665, 122 N. W. 403, this court said: "Under our system of elections, every voter is entitled to the opportunity to vote for or against any question submitted, separately and independently from his vote for or against other propositions submitted." The case cited involved a bond issue for the construction and installation of a waterworks pumping station, and an electric lighting plant in connection therewith. Paragraph 15 of the syllabus reads: "A resolution adopted by the city council, providing for an election to vote on the issuance of bonds, and a notice by the city auditor of such election, which state the purpose of the proposed bond issue to be 'to defray the cost of building and constructing a new waterworks pumping station and installing therein a new high duty pump and necessary steam boilers, . . . and for the purpose of installing an electric light plant in connection with said pumping station for furnishing street and other lights and power,' states two purpose., and an election held pursuant to such resolution and notice is illegal, and a majority vote in favor of issuing bonds for the purposes stated does not authorize or empower the city council to issue them." In the course of the opinion the court said: "The authorities are nearly unanimous to the effect that a proceeding by which two questions are submitted, when such questions or their subjects and purposes are not naturally related or connected, is invalid, and renders any election in which such questions have been so submitted invalid. . . . Among the reasons why both propositions should not be submitted to a single vote are that our whole election system, whether it relates to candidates or public improvements or works, is built up and founded

on the fundamental principle that every elector shall be given the opportunity to vote for or against any candidate, or any proposition, independent of and separate from his vote for or against any other candidate or proposition. No one would seriously argue that an election was fair which only admitted of the voter voting for or against all the candidates on any one party ticket, and inclosing all the names on one party ticket in a bracket would not make such a proceeding valid. It is equally important that the voter be given the same opportunity in voting on questions not relating to candidates. If two propositions can be joined in such a manner that the voter must vote for or against both, it admits of the submission of a question devoid of merit in connection with one for which there is a pressing demand, and of a weak proposition being carried on the strength of a worthy one."

In Hughes v. Horsky, 18 N. D. 474, 122 N. W. 799, the court, in applying the same principle, held that an election to issue bonds for the erection of two separate buildings to be used respectively for courthouse and jail purposes constituted two questions, and that the matter must be submitted in such manner that each voter might vote for or against each proposition independently of the other.

The reasoning in these cases is equally applicable to statutes submitted to the people for approval or rejection. Take the statute under consideration: A voter might be perfectly willing to change the personnel of the printing commission and extend the powers of such commission so as to embrace the printing for all the state departments and institutions, and yet absolutely opposed to making any change in the existing laws with respect to the designation of official newspapers of counties and cities, or in the laws relating to the newspapers in which private legal notices must be published. Certainly there is no necessary or proper connection between state printing and publication, and the publication of official proceedings of county commissioners, of the publication of citations in private proceedings and notices of foreclosure sales. And yet a voter at the referendum election was confronted with a situation where he either had to accept or reject all propositions; that is, he was put in a position where, in order to approve of the proposition that all state printing should be done under the supervision of the state printing and publication commission, he must also approve of the

propositions that such commission be authorized to designate all news-papers in which official and private notices required to be published under the laws of this state must be published; and that all such notices must be published in the papers so designated.

Clearly the reason for the rule embodied in § 61 is applicable as well to measures which have been submitted at a referendum election as to measures against which the power of referendum has not been invoked. Certainly no intent has been manifested to withdraw measures submitted at referendum elections from the operation of said section. The provision under which the act in question was referred provided: "The veto power of the governor shall not extend to measures initiated by or referred to the electors. No measures enacted or approved by a vote of the electors shall be repealed or amended by the legislature, except upon a yea and nay vote upon a roll call of two thirds of the members elected to each house." Hence, it is apparent that the framers of the provision under which the referendum election involved in this case was held had in mind, and clearly evidenced their intent, to limit the power of both the governor and the legislature in regard to measures which had been submitted to and approved by the electors. And they doubtless were also aware of the pending constitutional amendment tending to limit the power of the supreme court to adjudge legislation to be unconstitutional. If there had been any intention of further curtailing the power of the courts as to ruling upon the constitutionality of measures which received the approval of the electors at an election; or if it had been the intention to place measures which had been approved at a referendum election upon a different plane (so far as the power of the courts was concerned)—from measures which had been so approved, such intention would doubtless have been expressed in positive and unmistakable terms.

"The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and legal contemplation is as inoperative as if it had never been passed. Since an unconstitutional law is void, it imposes no duties and confers no power or authority on anyone; it affords protection to no one, and no one is bound to obey it, and no courts are bound to enforce it." 6 R. C. L. p. 117.

The members of the court are all agreed that § 61 of the Constitu-

tion still applies to laws enacted by the legislature, and which have not been submitted to and approved by the electors at a referendum election. In other words, all are agreed that a law enacted by the legislature in violation of § 61 of the Constitution is invalid as enacted, but it is contended that this invalid measure becomes valid if the power of the referendum is invoked and it is sustained by the electors at a referendum election. It is difficult to see why a measure void because enacted in a manner forbidden by the fundamental law of the state should become valid because it is of such nature that a sufficient number of the electors of the state are so dissatisfied with it that they seek to have it defeated by means of the referendum. The result is that a measure enacted in violation of § 61, which is so entirely satisfactory as not to cause the referendum to be applied, will fall, whereas one of such nature as to cause the referendum to be applied may be sustained. Will a referendum election make valid legislation which fails to receive the number of votes in either house as prescribed by the Constitution? Will it validate legislation like that involved in State v. Schultz, 44 N. D. 269, 174 N. W. 81, which in effect fails to pass in one of the houses? If measures which are invalid because passed in violation of the mandatory and prohibitory provisions of the Constitution may become valid laws upon receiving approval at a referendum election, then why may not every proposition submitted in the legislature be brought before the electors for ratification, regardless of whether it received the approval of either of the houses in the legislature? While no direct authority on the specific question under consideration has been cited or found, all judicial expressions on analogous or similar questions point one way. Thus in Bennett v. Drullard, 27 Cal. App. 180, 149 Pac. 368, the court of appeals of the state of California held that an initiative petition, setting forth an ordinance as an entirety and two alternative provisions, was void, and that no duty rested on the city authorities to eliminate as void the alternative provisions and submit the balance. In Thielke v. Albee, 76 Or. 449, 150 Pac. 854, the supreme court of Oregon held that the common council of the city may not initiate an ordinance and submit it to the people as an initiative measure without first passing it. In State ex rel. Gehlhar v. Boyer, 84 Or. 513, 165 Pac. 587, the supreme court of Oregon held that while the legislature, under the provisions of the

Constitution, might refer to the people any and all laws enacted by it, that a legislative bill passed by a majority of those present but by less than a majority of the whole membership of the legislature could not be submitted to the electors for approval at an election. In Tennent v. Seattle, 83 Wash. 108, 145 Pac. 83, the supreme court of Washington held that where an ordinance was amended and placed on its final reading, and passed in violation of a provision in the city charter to the effect that no ordinance shall be passed on its final reading at a meeting at which it is introduced, such ordinance was not rendered valid by the fact that it was opproved by popular vote at a referendum election pursuant to referendum petitions filed against the measure.

In my opinion, at least so much of chap. 188, Laws 1919, as relates to the designation of newspapers by the state printing and publication commission and the requirement that official statements and private legal notices must be published in such newspapers, is violative of the Constitution of this state.