May Term,
1846.

M'Cord, Executor, *v.* Ochiltree and Others.

M'Cord
v.
Ochiltree.

8b 15
139 140
139 272

8b 15
163 188

Bequest of the residue of personal estate as follows: "I give and bequeath unto the Theological Seminary at *South-Hanover,* in the state of *Indiana,* all the remainder of my estate, to continue a permanent fund, and the interest to be applied to the education of pious, indigent youths who are preparing themselves for the ministry of the Gospel, and those only who strictly adhere to the *Westminster* confession of faith in its literal meaning." The said seminary, at the death of the testator, was an unincorporated association. *Held,* that the bequest was void at law, because the objects of the testator's benevolence are too vaguely indicated to enable them to take the legacy without the interposition of a trustee, and because there was, at the death of the testator, no existing trustee capable of executing the trust intended to be created by the will.

The Courts of equity of this state possess the power, in addition to the usual jurisdiction of a Court of Chancery, of taking cognizance of and protecting the persons, rights, and property of infants, idiots, and lunatics, and of superintending and enforcing charities.

The principles of the statute of 43 *Elizabeth,* c. 4, commonly called the statute of charitable uses, with one or two exceptions, have been adopted and are in force in this state.

Such a bequest as that above mentioned, though void at law, will be enforced in equity as a charity, both in reference to the ·said statute of *Elizabeth,* and to the law of charities independently of that statute.

ERROR to the *Knox* Circuit Court.

Tuesday,
May 26.

Dewey, J.—In 1830, " the synod of the state of *Indiana* of the Presbyterian Church, whose standard of faith is the *Westminster* Confession," established a Theological Seminary at *South-Hanover ;* and by a compact with the trustees of the academy located there, which possessed corporate powers, made the seminary the theological department of that institution. In 1834, the academy having received collegiate powers by an act of the 'legislature, the connexion was dissolved, and a similar connexion formed with the college, there being an understanding between the parties that the synods of other states should have the privilege of joining the synod of *Indiana.* All the operations of the Theological Seminary were to be " conducted on the principle of a strict adherence to the standard of the Presbyterian Church in its obvious meaning." In 1840, the synod, with the consent of the college, removed the Theological Seminary to *New Albany,* and in 1842, the latter was incorporated under the name of " The Trustees of the *New Albany* Theological Seminary."

From its first establishment at *South-Hanover* until its incorporation, the seminary was always organized, and regularly conducted under the management of directors appointed for that purpose. In 1839, *John Ochiltree* made his last will and testament, and died in 1840. Among other bequests he made the following: "After paying all the foregoing bequests, I give and bequeath unto the Theological Seminary at *South-Hanover*, in the state of *Indiana*, all the remainder of my estate, to continue a permanent fund, and the interest to be applied to the education of pious, indigent youths who are preparing themselves for the ministry of the Gospel, and those only who strictly adhere to the *Westminster* confession of faith in its literal meaning."

The estate of the testator consisted of personal property and choses in action, all of which the executors were directed to convert into money, and to pay the proceeds to the several legatees. The only executor who proved the will and took letters testamentary was *Robert M'Cord*. The heirs at law of the testator are *George M. Ochiltree*, *John Ochiltree*, and *James Ochiltree*. These heirs demanded the above stated legacy of the executor, who refused to pay it to them, on the ground, that the trustees of the *New Albany* seminary claimed the right to hold the same in trust for the purpose expressed in the will. The heirs then brought this bill in equity making *M'Cord* the only defendant. They claim the legacy as being void at law.

The above facts appear from the bill, answer, and exhibits. The Circuit Court decreed in favour of the complainants.

The legacy in controversy is void at law, because the objects of the testator's benevolence — pious, indigent youths preparing for the ministry of the Gospel according to a particular standard of faith — are too vaguely indicated to enable them to take the legacy without the interposition of a trustee; and because there was, at the death of the testator, no existing trustee capable of executing the trust intended to be created by the will. The Theological Seminary, being at that time an unincorporated society, could not execute a trust of that character, being the application of a permanent fund to a particular purpose, for the want of succession. *The Baptist Association* v. *Hart's Executors*, 4 Wheat. 1. See, also,

Anon. 1 Ch. Cas. 207.— *Case of Christ's College*, 1 W. Blacks. 90.— *Collison's Case*, Hob. 136.— *Widmore* v. *Woodroffe*, Amb. 636.—Com. Dig. Devise, K.—2 Story's Eq. 396, 397.

The *English* Court of Chancery, however, as we shall show, would give effect to such a legacy as a charitable trust. But it is contended in behalf of the complainants, that our Courts of equity do not, and cannot constitutionally, possess jurisdiction adequate to effect that purpose.

The jurisdiction of the *English* Court of Chancery has several branches, and is derived from various sources. The most important branch of its power is that general one which it exercises as a Court of ,*equity*, in common with the Court of Exchequer; but besides this extensive *equity* jurisdiction, it has other powers which are peculiar to itself. Of these powers it will be necessary, on the present occasion, to notice but one— that which is delegated to it by the crown, as *parens patriæ*. Within this branch of its jurisdiction is classed the superintendence of infants, idiots, lunatics, and certain charities. 3 Blacks. Comm. 427.—2 Fonb. Eq. 205.—*Cary* v. *Bertie*, 2 Vern. 333.— Cooper's Eq. Int. 27. This is the branch of chancery jurisdiction which it is contended our Courts of equity do not possess.

The whole judicial power of this state, "both as to matters of law and *equity*," is "vested in one Supreme Court, in Circuit Courts, and in such other inferior Courts as the general assembly may, from time to time, direct and establish." Const. art. 5, sect. 1. By the second section of the same article, the Supreme Court is to have appellate jurisdiction only, except "in capital cases, and cases in *chancery*, where the president of the Circuit Court may be interested," &c. The third section confers original common law and *chancery* jurisdiction on the Circuit Courts.

It is evident that the framers of the constitution used the words equity and chancery as convertible terms. No inference, therefore, as to the *extent* of the jurisdiction meant to be conferred upon our Courts, can be inferred from the use of the one or the other; and we must look to other considerations to guide us to the true construction of the constitution in this respect.

May Term, 1846.

M'Cord v. Ochiltree.

In 1807, the judiciary power of the *Indiana* territory was vested in a General Court, a Court of Chancery, Courts of Common Pleas, and in justices of the peace, the latter having a limited criminal jurisdiction. The General Court, sitting in bank, was a Court of Errors; its judges were required to hold *nisi prius* Courts on the circuits. This Court and its judges on the circuits possessed a common law jurisdiction in criminal and civil cases. The Court of Chancery "exercised all the powers usually exercised by Courts of equity." The Courts of Common Pleas, in addition to a common law jurisdiction, were clothed with the power of appointing guardians for infants, of ordering a sale of minors' estates in certain cases, and of settling guardians' accounts. In 1813, during the first session of the fourth territorial legislature, certain chancery powers were given to the Courts of Common Pleas, a mixed practice, partly common law and partly chancery, was prescribed in those Courts in the same cause; and the Court of Chancery was prospectively abolished. At the second session of the same legislature held in the same year, the Courts of Common Pleas, and the Circuit Courts held by the judges of the General Court, were abolished, the territory was divided into circuits, and one of the judges of the General Court, with two associates, was constituted a new Circuit Court in each county. To these new Courts was transferred all the jurisdiction of the old Circuit Courts, of the Courts of Common Pleas, and of the Court of Chancery. The next legislature, held in 1814, by one act created other Circuit Courts, by another act transferred to them the business pending before the Circuit Courts of the last year's creation, by a third act prescribed common law practice in these new Courts, and by a fourth act finally abolished the Court of Chancery, transferred its powers to the Circuit Courts, and prescribed therein also rules of chancery practice. Thus stood the system (if system it can be called) of the territorial judiciary in 1816, when the constitution was formed.

The counsel of the complainants argues that, from this state of things, fluctuating and imperfect as it was, the framers of the constitution had become familiar with the idea of a Court of Chancery exercising only the usual jurisdiction of a Court of equity, to the exclusion of a power similar to

that under which the *English* Court of Chancery enforces charities, and superintends and protects the persons, rights, and interests of infants, idiots, and lunatics; and that being thus impressed they authorized the establishment of Courts of Chancery, with only the restricted jurisdiction. We cannot think so. The legislature is certainly competent to confer the extended jurisdiction upon either the common law or chancery side of our Courts. The superintendence of infants, idiots, lunatics, and charities must abide somewhere. If the position assumed in respect to the jurisdiction of our Courts of Chancery could be sustained, the consequence would be, that matters, belonging with peculiar propriety to them, must be committed to the cognizance of the common law Courts. We can see no rational cause, which could induce the makers of the constitution to compel the legislature thus to swell the common law jurisdiction, and to curtail that of chancery. And we apprehend that if the same limited construction of the constitution, which is contended for in regard to the jurisdiction of our Courts of Chancery, were to prevail both as to them and the common law Courts too, every law, passed since we became a state, for the protection of infants, idiots, and lunatics, by proceedings in the Circuit Courts, would be unconstitutional and void. Those Courts possess by the constitution only common law and chancery jurisdiction; and if the laws referred to cannot be supported under the latter head, they cannot be vindicated at all; they certainly are not referrible to the common law jurisdiction.

But there is another consideration, which we think has a strong bearing on this subject. As early as 1795, the North Western territory adopted the common law of *England*. That adoption continued through the whole of our territorial existence, and still continues. The prerogative of the *English* crown is a part of the common law. Hale's Hist. of the C. L. 25. Undoubtedly, some branches of the royal prerogative are not adapted to our institutions, and have no existence among us. But no one will deny that the branch of it which enjoins upon the king, as *parens patriæ*, the duty of looking after the welfare of those who, from tender age and imbecility of mind, are incapable of taking care of themselves, contains a principle necessary to the well being of any

state, whatever may be the form of its government. It is certainly no less applicable and beneficial to republics than to monarchies. This common law principle has been enforced in *England*, from time immemorial, by the Court of Chancery acting under its delegated jurisdiction from the king, as *parens patriæ*, as distinguished from its ordinary general *equity* jurisdiction. There was not, when our constitution was adopted, nor is there even now, any statutory system, affording to infants, idiots, and lunatics that full and ample protection of their persons, their rights, their property, and to the morals of infants, which is to be found in the *English* Court of Chancery, when exercising this peculiar branch of its jurisdiction. The framers of our constitution cannot be supposed to have been ignorant of these matters; and knowing them, they could not, we think, have designed to exclude from our Courts of Chancery, the exercise of a jurisdiction so necessary and beneficial.

Our construction, therefore, is, that the constitution does not forbid the establishment of Courts of Chancery with power, in addition to the usual jurisdiction of a Court of equity, of taking cognizance of and protecting the persons, rights, and property of infants, idiots, and lunatics, and of superintending and enforcing charities.

The first state legislature accordingly established our Circuit Courts as they are now organized, and clothed them with "original jurisdiction in all causes, *matters*, and *things* at law and in chancery." Laws of 1817, p. 16. These Courts, therefore, possess both the branches of chancery jurisdiction which we have been considering. This view of the subject vindicates the case of *Peck et al.* v. *Braman*, 2 Blackf. 141, in which this Court held that "the guardianship of minors, and the adjustment of their accounts, form a conspicuous branch of chancery jurisdiction."

It is now well established (contrary to the opinions of distinguished chancellors and writers heretofore entertained), that the *English* Court of Chancery possesses an inherent jurisdiction which it has always exercised to enforce and effectuate charities, which at law were illegal or informal gifts. *Vidal et al.* v. *Girard's Ex'rs*, 2 Howard, 127, and the authorities there cited. But since the passage of the

statute of the 43 *Elizabeth*, c. 4, commonly called the statute of charitable uses, the decisions have been founded principally upon that act; and the jurisdiction has been considered as confined to the charities therein enumerated, or to those which by analogy are within its spirit and intention. *Attorney General* v. *Hewer*, 2 Vernon, 387.—2 Story's Eq. 403. It may therefore be proper, though it is not absolutely necessary to the decision of this cause, to inquire whether that statute is in force in this state.

In addition to the common law, we have adopted " all statutes or acts of the *British* parliament made in aid of the common law prior to the fourth year of the reign of king *James* the first, excepting the second section of the sixth chapter of forty-third *Elizabeth*, the eighth chapter, thirteenth *Elizabeth*, and ninth chapter, thirty-seventh *Henry* eighth, and which are of a general nature, not local to that kingdom, and not inconsistent with the laws of this state." R. S. 1843, p. 1030. The statute in question we conceive to be in aid of the common law, for though it gave no new jurisdiction to the Court of Chancery, it enumerated and specified subjects of its cognizance which, prior to its passage, seem to have been involved somewhat in doubt and obscurity. That our legislatures which, from time to time, have adopted, in nearly the same language, the *English* statutes in aid of the common law, meant to exclude this act we cannot believe. Their attention in making the adoptions was turned particularly to the statutes passed in the reign of *Elizabeth*, and although they were careful to exclude expressly some provisions of trifling import, they did not name as among the exceptions this important act (1). Had they designed not to adopt it, we think they would have said so. Nor are its provisions, with one or two exceptions, in their nature local to *Great Britain*, nor incompatible with the laws of this state. The uses enumerated by the act are gifts, &c., "for relief of aged, impotent, and poor people; for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars of universities; for repair of bridges, ports, havens, causeways, churches, sea-banks, and highways; for education and preferment of orphans; for or towards the relief, stock, or maintenance of houses of correction; for mar-

riages of poor maids; for supportation, aid, and help of young tradesmen, handicraftsmen, and persons decayed, and others; for relief or redemption of prisoners or captives, and for aid or ease of any poor inhabitants; concerning payment of fifteens, setting out of soldiers, and other taxes." 1 Bac. Abr. 580. The act contains provisions by which gifts, &c., for the enumerated objects are to be executed agreeably to the intention of the donor, &c.

We have several statutory incorporations, the objects of which are to promote literary and religious education; but we have no law, independently of the laws adopted from *England*, for the protection and enforcement of charities designed to be bestowed in trust upon those institutions, but which, through some legal defect, cannot be enforced, except in a tribunal authorized to look to the will of the donor, instead of the formalities of the law. Such a statute as the one in question is needed by us. We think its principles, with the exception of one or two, have been adopted and are in force in this state. Nor is our policy singular in this respect. Several of the other states of the Union have also adopted that statute.

That the *English* Court of Chancery will sustain, as a charity, a gift void at law, is established by numerous decisions. It will be necessary to quote but a few of them. In *Attorney General* v. *Hickman*, 2 Ch. Cas. Abr. 193, it was decided that a legacy to certain trustees, to be distributed in charity, though lapsed at law by the death of all the trustees in the life-time of the testator, was good as a charity. In *Mills* v. *Farmer*, 1 Mer. 55, the Court held that a bequest as a charity to such person as the executor should name, and no executor was appointed, was valid, and would be executed by the Court, assuming the office of executor. See, also, *Moggridge* v. *Thackwell*, 7 Ves. 36. So, it has been held that a devise of a sum of money charged upon real estate, "to be applied to such charitable use as the testator had by writing under his hand formerly directed," and no such writing could be found, was good as a charity, and would be disposed of by the Court according to the direction of the king. *Attorney General* v. *Syderfen*, 1 Vern. 224. "A devise of lands to the church-wardens of a parish (who are not a cor-

poration capable of holding lands) for a charitable purpose, although void at law will be sustained in equity." 2 Story's Eq. 415. In *White* v. *White*, 1 Bro. C. C. 12, it was held that a devise as a charity to a corporation by a wrong name, though void at law was valid in equity. In the case of the *Baptist Association* v. *Hart's Ex'rs, supra*, which was in equity, and certified from the *U. S.* Circuit Court for the district of *Virginia*, the bequest, which gave rise to the controversy, was extremely similar to the one under consideration. It was a residuary legacy to "the Baptist Association that for ordinary" met at *Philadelphia* annually, as a permanent fund "for the education of youths of the Baptist denomination" who should "appear promising for the ministry, always giving a preference to the descendants" of the testator's family. The Baptist Association was, like the Theological Seminary in this case, a regularly organized but unincorporated body at and previous to the date of the will, and was not incorporated until after the death of the testator. The cause was decided against the legatees, on the ground that the statute of the 43 *Elizabeth*, c. 4, was not in force in *Virginia*, and that without the aid of that statute, the Court in *Virginia* exercising the same jurisdiction as the *English* Court of Chancery possessed at common law, had no power to enforce a charity void at law; but Ch. J. *Marshall* in delivering the opinion of the Court remarked, "that such a legacy would be sustained in *England* is admitted." This case so far as it decided that the *English* Court of Chancery had no power to execute a charity void at law, independently of the statute of *Elizabeth*, was overruled by the case of *Vidal* v. *Girard's Ex'rs, supra*, in which, after a very full review of all the authorities, it was held "that there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects for which a Court of equity has at all times interfered to make good that which at law was an illegal or informal gift; and that cases of charity in Courts of equity in *England* were valid independently of and previously to the statute of *Elizabeth*." Had such been the opinion entertained by the Court in the case of the *Baptist Association* v. *Hart's Executors*, there can be no doubt that the legacy in that case would have been sustained as a charity.

May Term, 1846.

M'CORD
v.
OCHILTREE.

May Term,     Our opinion is that the legacy under consideration, though
  1846.      void at law for the want of trustees capable, at the death of
Coquillard    the testator, of taking or executing the trust, and on account
    v.        of the vague indication of the objects of · the charity, is
 Suydam.      valid as a charity, both in reference to the statute of *Eliza-
beth*, and to the law of charities in a Court of equity as it
stood before the passage of that act. The heirs of *Ochiltree*
are barred by the will; and the bill should have been dis-
missed.

*Per Curiam.*—The decree is reversed with costs. Cause
remanded, &c.

*R. Crawford*, for the plaintiff.

*S. Judah*, for the defendants.

˙(1) The statutory provisions excepted from the operation of the acts adopt-
ing the *English* statutes, are set out in a note to *Stevenson* v. *Cloud*, 5
Blackf. 94.