STATE EX REL. EMMERT ET AL. *v.* UNION TRUST COMPANY OF INDIANAPOLIS ET AL.

[No. 28,551. Filed June 8, 1949.
Rehearing denied September 24, 1949.]

572

*Gilkison, J.* dissents.

*Emmert, J.* not participating.

*J. Emmett McManamon* and *Cleon H. Foust,* Attorneys General, *Frank E. Coughlin,* First Deputy Attorney General, *Thomas L. Webber,* Deputy Attorney General, and *Judson L. Starke,* Prosecuting Attorney, 19th Judicial Circuit, for appellant.

*Davis, Baltzell, Hartsock & Dongus;* and *John G. Rauch,* all of Indianapolis, for appellee.

STARR, J.—The complaint in this action is in two paragraphs. The allegations of each paragraph which are pertinent to this opinion are substantially as follows: that on September 4, 1923, the last will and testament of Laura Fletcher Hodges, deceased, was admitted to probate by the Marion Probate Court and letters testamentary issued to the appellees, The Union Trust Company of Indianapolis and Fletcher Hodges, who were named co-executors of the will; that the co-executors,

after qualifying, proceeded to administer upon the estate of the decedent and to carry out and execute the provisions of the will; that by the will the appellees, Fletcher Hodges and the Trust Company, were named co-trustees of the decedent's residuary estate and are now serving as such trustees; that by Items 3 and 4 of the will, the decedent made the following provisions relating to the diaries of her grandfather, Calvin Fletcher, to-wit:

"Item Three: In the event that I shall not in my life time have made publication of the diary of my grandfather, Calvin Fletcher, I direct that the Executor of this my last will and testament procure to be edited by a qualified person and to be printed and published at a reasonable cost the diaries of my grandfather, Calvin Fletcher—the same to be dedicated to my father, Stoughton A. Fletcher, Jr., —and to make proper distribution of the same.

"Item Four: In the event that Edith Fletcher Churchman shall be in my employ at the time of my death, I direct that the Executor of this my last will and testament shall for the six months next ensuing after such Executor's qualifying as such Executor, employ at the same salary she shall be receiving from me at the time, said Edith Fletcher Churchman to collaborate with the editor of said diaries of my grandfather, Calvin Fletcher, or do any other kind of work that is acceptable to said Edith Fletcher Churchman."

That Calvin Fletcher was a lawyer and banker with marked literary ability; that he settled in the City of Indianapolis in the year 1821; that he kept a diary in which he made daily entries and voluminous notes as to the happenings and doings in the city from 1821 to 1866 and with few exceptions, these entries were made at daily intervals; that contained in these diaries is material of great historical value to the state and nation;

that these diaries were the property of the testatrix at the time of her death.

It is further alleged that the said Edith Fletcher Churchman died prior to the settlement of the estate; that all the residue of the property of the estate was turned over to the appellees, Fletcher Hodges, and The Union Trust Company of Indianapolis as co-trustees under the will, and they are now collecting the rents and profits therefrom; and, finally, that the diaries have never been edited, printed, published or distributed.

Each paragraph asks, among other things, that the court find and decree that the provisions of the will relating to the editing, printing, publication and proper distribution of the diaries constitutes a public charitable trust; that the court find and determine the reasonable cost of editing, printing, publishing and making proper distribution of these diaries; that the trustees be removed as trustees of this public charitable trust; that a suitable person be appointed trustee for the purpose of carrying out the same; that the defendants, The Union Trust Company of Indianapolis and Fletcher Hodges, out of the trust funds as testamentary trustees, be ordered to pay over to the successor trustee such sum of money as the court shall find to be the reasonable cost and expense of carrying out the trust, and that the successor trustee be ordered to proceed as expeditiously as possible to edit, print, publish, distribute and dedicate the diaries, and generally to execute and carry out the provisions of the trust.

To this complaint the appellees filed their separate demurrers to each paragraph which were sustained by the trial court; upon appellant's election to stand upon this ruling and its refusal to amend, judgment was rendered that appellant take nothing by its complaint. From this judgment this appeal has been taken.

These demurrers challenged each paragraph of complaint on the ground, among others, that the appellant had no interest as no charitable trust was created by this will. In view of our conclusion upon this subject it will only be necessary to decide this particular question.

Although the books abound with definitions of a charitable trust, one of the best that we have found is that "A charitable trust is a gift for the benefit of persons, either by bringing their hearts and minds under the influence of education or religion, by relieving their bodies of disease, suffering, or constraint, by assisting to establish them for life, by erecting or maintaining public buildings, or in other ways lessening the burdens or making better the condition of the general public, or some class of the general public, indefinite as to names and numbers. In short, it is a gift to a general public use." *In re Lennon* (1907), 152 Cal. 327, 92 Pac. 870.

From an examination of the decisions it can be said that our courts strongly favor public trusts for charitable uses and liberally construe deeds and wills in which the maker evinces a charitable purpose and never declare them invalid if they can, by any possibility consistent with the law, be held valid. See *Dykeman* v. *Jenkines* (1913), 179 Ind. 549, 101 N. E. 1013; *Crawfordsville Tr. Co.* v. *Elston Bank and Tr. Co.* (1940), 216 Ind. 596, 25 N. E. 2d 626.

It is the law in Indiana and in several other jurisdictions that a bequest to charity generally, coupled with the appointment of a trustee empowered to select in his discretion the charitable objects or purposes to which the trust funds are to be devoted, is a valid testamentary disposition. *Hulet* v. *Crawfordsville Trust Co.* (1946), 117 Ind. App. 125, 69

N. E. 2d 823. For a general discussion of this proposition see 168 A. L. R. 1350, Note.

In the case of a testamentary charitable trust, the will itself must point out and make apparent, with reasonable definiteness and certainty that the bequest ■ is for a purpose recognized in law as charitable. 14 C. J. S., Charities, § 20, p. 453. It has been well said: "A charitable trust, like an express private trust, is created only if the settlor properly manifests an intention to create it. The settlor need not, however, use any particular language in showing his intention to create a charitable trust; he need not use the word 'trust' or 'trustee.' It is sufficient if he shows an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable." 3 *Scott on Trusts*, § 351, p. 1932.

With the foregoing principles in mind we approach Item 3 of this will. In this will no charitable intent, which is necessary to establish a public trust, is ■ apparent. The will does not evince with reasonable definiteness and certainty a charitable purpose. There is no statement or description therein from which a charitable purpose or the object thereof can be ascertained or identified by evidence. The bequest or direction of this item does not expressly or impliedly disclose any beneficiary or that it is intended to be either public or charitable; it is wholly uncertain. For all we know this bequest or direction may have been for private gain. Item 6 of this will, which created a residuary trust estate, does not mention these diaries, nor is there any other provision of this will which indicates a charitable purpose or the objects of such a charity.

It is true that by their demurrers the appellees admit that the diaries were of educational value. Had the will

expressed an intent that the diaries should be held subject to a legal obligation to devote them to educational purposes, there is no doubt that the same would have constituted a charitable trust. The admission by the demurrer that the diaries were of an educational value, however, does not add to, eliminate or vary the terms of the will as written. A court has no authority to make a will nor power to admit extrinsic evidence to add to, eliminate or vary the terms of the will as written. Its province is limited to a construction of the language adopted by the maker as expressive of his intention. *McConnell* v. *Robbins* (1923), 193 Ind. 359, 140 N. E. 59. The purpose of Item 3 is left entirely blank. Extrinsic evidence could not be used to add to the will provisions sufficient to make apparent that the intent of the testator was to create a charitable trust or that the bequest was for a charity such as contemplated in charitable trusts. This is not a case of latent ambiguity as there is no language in the will relating to a charitable trust to be interpreted. Effect cannot be given to an intention proven by extrinsic evidence without regard to the will as the intention must be gathered from the language found in the instrument itself. *Daughtery, Administrator* v. *Rogers* (1889), 119 Ind. 254, 20 N. E. 779; *Martin* v. *Raff* (1944), 114 Ind. App. 507, 52 N. E. 2d 839.

For the reasons herein expressed the judgment of the lower court is affirmed.

Gilkison, J. dissents.

Emmert, J. not participating.

NOTE.—Reported in 86 N. E. 2d 450.

## DISSENTING OPINION

GILKISON, C. J.—The majority opinion is based entirely upon negative inferences allegedly drawn from Item 3 of the will. They are stated in the opinion as follows: 1. "In this will no charitable intent, which is necessary to establish a public trust, is apparent." 2. "The will does not evince with reasonable definiteness and certainty a charitable purpose." 3. "There is no statement or description therein from which a charitable purpose or the object thereof can be ascertained or identified by evidence." 4. "The bequest or direction of this Item does not expressly or impliedly disclose any beneficiary or that it is intended to be either public or charitable; it is wholly uncertain." 5. "For all we know this bequest or direction may have been for private gain."

I shall discuss these five inferences in the order given. Since the first three are on the same subject, an absence of charitable intent, I shall discuss them together. Item 3 of the will is as follows:

"Item Three: In the event that I shall not in my life time have made publication of the diary of my grandfather, Calvin Fletcher, I direct that the Executor of this my last will and testament procure to be edited by a qualified person and to be printed and published at a reasonable cost the diaries of my grandfather, Calvin Fletcher— the same to be dedicated to my father, Stoughton A. Fletcher, Jr.,— and to make proper distribution of the same."

This Item is in a single sentence, and is in simple, direct and easily understandable words. It clearly and imperatively expressed testatrix's intention to make *publication* of her grandfather's diaries at her own expense during her lifetime. But, realizing that she might

not live long enough fully to accomplish this purpose, she, by this Item clearly, firmly, unequivocally and imperatively directed, in that event, that the executors of her will must cause the diaries to be edited by a qualified person and cause them then to be printed, published, dedicated to her father, Stoughton A. Fletcher, Jr., and properly distributed at the expense of her estate.

The majority opinion in its five negative inferences apparently ignores the words "publication," "published at a reasonable cost" and "distribution" as used in this seventy-nine word affirmative Item of the will. Let us consider their meaning and therefrom ascertain whether there is any basis in law or equity upon which to base those inferences.

"Publication" as used in this Item of the will means the act of publishing or making the diaries public; offering them to public notice, *or rendering them accessible to public scrutiny. Linley* v. *Citizens National Bank* (1917), 108 S. C. 372, 381, 94 S. E. 874, 877. An advising of the public; a making known of something to them for a purpose. *Associated Press* v. *International News Service* (C. C. A.), 245 Fed. 244, 250, 251. *It implies the means of conveying knowledge or notice. Daly* v. *Beery* (1920), 45 N. D. 287, 294, 178 N. W. 104, 106; *Blacks Law Dictionary* (3rd Ed.), p. 1463; *Bouvier's Law Dictionary* (Rawle's 3rd Rev.), Vol. 3, p. 2767; *Standard Dictionary; Websters Unabridged Dictionary.*

"Published" as used in this Item means: "To make known or announce publicly, as something that otherwise might have remained private or unknown; notify the public of orally, or in writing or printing; promulgate; proclaim; divulge; as, to publish a discovery of some news." *Standard Dictionary.* 1. "To make public announcement of; to make known to people in general;

to divulge; to disseminate; as to publish one's opinion far and wide. 3. To bring before the public, as for sale or distribution; esp: a. to print, or cause to be printed, and to issue from the press either for sale or general distribution, as a book, newspaper, piece of music, engraving, etc." *Webster's International Dictionary* (2d Ed.).

The meaning of "distribution" as used in this Item is the second definition given in *Webster's Unabridged Dictionary* thus: "The act of giving in charity; a bestowing in parts." It is the first and third definitions given in the *Standard Dictionary,* thus: (1) "The act of distributing; division among a number of persons or things; apportionment, as the distribution of money in charity; . . . (3) That which is distributed as, charitable distributions." It is the second definition given in *Webster's Universal Unabridged Dictionary,* thus: "The act of giving in charity; the bestowing in portions. 'Of great riches there is no real use except it be in the *distribution.*—Bacon.' " It is the 1st, and 4th definitions given in *Webster's New International Dictionary* (2d Ed.) thus: "1. Act of distributing; apportionment among several or many; as, distribution of gifts. 4. That which is distributed; as, charitable distributions."

From these many definitions I think it is manifest that the first three negative inferences indulged, and upon which the majority opinion rests, are each wholly without foundation, and the opinion therefore rests upon inferences that are arbitrary and not such as can be drawn from Item 3 of the will.

By this Item, agreeable with approved definitions as noted herein, it conclusively appears that it was the very positive purpose of the testatrix that the diaries in question, at her own expense, or that of her estate, if

she died before accomplishing the purpose, should be carefully edited, printed, dedicated, published and distributed, so it would be accessible to the scrutiny and use of the general public. It is equally apparent that she intended to do this as a public charity. On this proposition I think the majority opinion is clearly erroneous.

A gift to the use of the general public is always construed to be a public charitable trust. *Black's Law Dictionary* (3rd Ed.), page 312; *Taylor* v. *Hoak* (1922), 273 Pa. 194, 196, 116 Atl. 826, 21 A. L. R. 946, 948; *Erskine* v. *Whitehead, Exr. et al.* (1882), 84 Ind. 357, 369.

"A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well doing and well being of social man. Perry Tr. Sec. 687." *Ould* v. *Washington Hospital for Foundlings* (1887), 95 U. S. 303, 311, 24 L. Ed. 450, 451.

"A charitable gift, above all others, is to be construed *ut res magis valeat quam pereat*" (that the thing may rather have effect than be destroyed) and "If there are two meanings of a word, one of which will effectuate and the other will defeat the testator's object, the court is bound to select that meaning of the word which will carry out the intention and objects of the testator. *Whicker* v. *Hume,* 7 H. L. Cas. 154." *Saltonstall & others* v. *Sanders & others* (1865), 93 Mass. (11 Allen) 446, 455. If "the language used in a will is reasonably susceptible of two different constructions, one of which will defeat and the other sustain the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it." *Dykeman* v. *Jenkines* (1913), 179 Ind. 549, 555, 556, 101 N. E. 1013; *Herron* v. *Stanton, Admr.* (1922), 79 Ind. App. 683, 691, 147 N. E. 305; *Russell*

v. *Allen* (1882), 107 U. S. 163, 166, 27 L. Ed. 397, 398, 399; *Hoeffer* v. *Clogan* (1898), 171 Ill. 462, 467, 468, 63 Am. St. 241, and anno.; *Crawfordsville Tr. Co.* v. *Elston Bank & Tr. Co.* (1940), 216 Ind. 596, 614, 615, 25 N. E. 2d 626; *Richards* v. *Wilson* (1916), 185 Ind. 335, 392, 394, 112 N. E. 780, and authorities cited; *Maxcy* v. *City of Oshkosh* (1910), 144 Wis. 238, 249, 261, 128 N. W. 899, 31 L. R. A. (N. S.) 787; 2 Perry, *Trusts* (6th ed.) § 709; Flint, *Trusts and Trustees* § 274; *Daily* v. *City of New Haven* (1891), 60 Conn. 314, 322, 22 Atl. 945, 14 L. R. A. 69; *In re Robinson* (1911), 203 N. Y. 380, 388, 96 N. E. 925, 37 L. R. A. (N. S.) 1023; *Inglis* v. *Trustees of the Sailor's Snug Harbor* (1830), 3 Peters (U. S.) 99, 116, 7 L. Ed. 617, 624.

In *Herron* v. *Stanton, Admr., supra,* at page 690, 691, our Appellate Court said:

"In construing a will, or any item or provision thereof, the primary object is to ascertain the intention of the testator. *Stieglitz* v. *Migatz* (1914), 182 Ind. 549, 105 N. E. 465. The intention of the testator must be ascertained from the language used in the will; and where the language used is reasonably susceptible of two constructions, one of which would violate an established rule of law, and thus destroy an intended provision, and the other would sustain the provision, the latter must be followed."

So in this case the words "publication" "published" and "distribution" as used in this Item of the will must be given their usual, and ordinary meaning to sustain testatrix's intentions. They cannot be ignored. I think it is error for this court to remake testatrix's will by reading inferences into it, that are repugnant to every thought so clearly expressed by testatrix and thus to nullify her charitable purpose. To me it is evident

that by the use of these words testatrix clearly expressed her intention to do a public charity.

As said in an early Indiana case with facts very similar to the case at bar:

> "That this bequest can be sustained as a charity we have no doubt. It is in aid of the cause of education. Books are essential means and instruments in advancing that cause. And in cases of such bequests equity will supply trustees and settle schemes for their administration, whenever it may be necessary."

*Sweeney and Another* v. *Sampson, Exr.* (1854), 5 Ind. 465, 476; *Dykeman* v. *Jenkins, supra,* page 562; 2 Perry, *Trusts* (6th ed.), § 722; *Russell* v. *Allen, supra.* Even at that early day the court further said:

> "We shall not go into an examination of the authorities for the purpose of establishing these positions. Since the case of *Vidal et al.* v. *Girard's Executors* in the Supreme Court of the United States, 2 Howard 127 (1844), and that of *McCord* v. *Ochiltree* (1846), in this Court, 8 Blackf. 15, such an examination would be a work of supererogation by us."

The court then quoted with approval from *Hill on Trustees,* p. 463, among other things as follows:

> "But it is plain, that in ordinary cases a most important part of the duty of trustees is to preserve the trust property, and it lies with those who seek to support a sale by them to show that the transaction in question was beneficial for the charity. In the absence of such proofs, and *a fortiori* if there be any evidence showing that the sale was improvident or prejudicial to the charity, it will be treated as a breach of trust and set aside."

Undoubtedly, and unquestionably, any disposition of the property that is *improvident or prejudicial to the*

*trust created by this will* should be treated as a breach of trust and set aside.

The fourth and fifth negative inference indulged in the majority opinion seem to imply, that there is a nullifying vagueness in the beneficiaries or as to whether the trust is public or charitable, and that the "bequest or direction" may have been for private gain. The question of vagueness that thus disturbed the majority has been so well answered by the Supreme Court of Maine in such apt words and so corrective to the reasoning in the majority opinion that I quote them, thus:

> "Indeed it is said that vagueness is in some respects essential to a good gift for a public charity, and that a public charity begins where uncertainty in the recipient begins."

*Piper* v. *Moulton,* 72 Me. 155, 159, Note 39 Am. Rep. 739; 2 *Perry,* Trusts § 687. Also *Ackerman* v. *Fichter* (1913), 179 Ind. 392, 399, 401, 101 N. E. 493, 46 L. R. A. (N. S.) 221, and cases cited; *Dykeman* v. *Jenkines, supra,* page 564; *Russell* v. *Allen, supra,* page 166, U. S. page 399, L. Ed.

In *Ackerman* v. *Fichter, supra,* this court said at page 399:

> ". . . and the specific object of the charity named, is sufficient, although the beneficiaries are uncertain in number and identity, *for that is the essential feature of a charitable use, or public charity, as distinguished from a private trust."* (My italics).

*In re Schouler* (1883), 134 Mass. 426, 427; *Jackson* v. *Phillips* (1867), 14 Allen (Mass.) 539; *In re Kavanaugh's Estate* (1910), 143 Wis. 90, 100, 126 N. W. 672, 28 L. R. A. (N. S.) 470; *In re O'Donnell's Estate* (1904), 209 Pa. St. 63, 64, 58 Atl. 120; *Hoeffer* v. *Clogan* (1898), 171 Ill. 462, 49 N. E. 527, 40 L. R. A. 730, 63 Am. St.

241; *Coleman* v. *O'Leary's Exr.* (1902), 114 Ky. 388, 406, 70 S. W. 1068; *Hadley* v. *Forsee* (1907), 203 Mo. 418, 427, 101 S. W. 59, 14 L. R. A. (N. S.) 104 and notes; *Barr, Trustee* v. *Geary, Auditor* (1924), 82 Ind. App. 5, 20, 142 N. E. 622; 2 Perry, *Trusts* (6th ed.), § 687; *Re: Estate of Funk* (1946), 353 Pa. 321, 45 A. 2d 67, 163 A. L. R. 780.

In *Haines et al.* v. *Allen et al.* (1881), 78 Ind. 100 at page 102, this court said:

> "The will need not point out any plan by which the objects of the bequest shall be accomplished. It is sufficient if the will appoints trustees, with power to appropriate the money in aid of the object named, in such manner as they shall think fit. *Whitman* v. *Lex,* 17 S. & R. 88; *Beekman* v. *Bonsor,* 23 N. Y. 298. . . . Where trustees capable of taking the legal estate were originally appointed, so that a valid use was in the first instance raised, and the case was thus brought within the jurisdiction of the court of chancery, that court will supply any defect which may arise in consequence of the death, or disability or refusal of the trustees to act."

In *Crawfordsville Trust Co.* v. *Elston Bank and Trust Co.,* *supra,* at page 609, this court said:

> "Some of the confusion in the language of the early cases on this question apparently arose from a confusion between the requisites for a valid private trust and the necessary requisites of a charitable trust. From the very nature of a charitable gift or charitable trust the requisite of certainty is less strict than in the case of a private trust. All charities are trusts in the sense that the property must be devoted to the general purpose specified by the donor, but in a case where property is given directly to a charitable institution for the purpose of promoting some or all of its general charitable purposes it is not a trust in the same sense as an ordinary private trust. The courts have uniformly recognized the differences between charitable gifts or charitable trusts on the one hand and

private trusts on the other hand. The recognition of these differences has been reflected in the liberality with which the courts have sustained charitable trusts and have upheld gifts to charity. Where the intent of the testator to make a charitable gift is clear, our courts have gone far in attempting to sustain such a gift, even though it be under such circumstances that if applied to a private trust it would fail. *Dykeman* v. *Jenkines* (1913), 179 Ind. 549, 555, 101 N. E. 1013. So in the instant case, although the power of disposition given to the widow was so broad that the amount of the charitable bequests could not be definitely ascertained at the time of the testator's death, this fact does not furnish a sufficient reason for holding such bequests invalid. *Cruse* v. *Axtell* (1875), 50 Ind. 49; *Hall* v. *Grand Lodge I. O. O. F.* (1914), 55 Ind. App. 324, 103 N. E. 854; *Cotton* v. *Town of Danville, supra.*"

On this subject the Supreme Court of Maine in another case said:

"But it is claimed that vagueness and uncertainty attaches both to the character of the books to be distributed and the persons or class who are the beneficiaries under the gift."

Answering this contention the court said:

"Words used in a will, as in other instruments, are construed in connection with the words in whose company they are found, *as well as in the light of the circumstances, in and under which, they are used.* . . . It is true no beneficiaries are named. If this is a public charity it is not necessary that any should be. The persons to be reached are left to the discretion of the trustees, and are otherwise unlimited in numbers or class. The object to be accomplished may be considered the general welfare of the community, or, if the circumstances permit even that of mankind. In either view it may be sustained, as in the case of the gift for the Smithsonian Institute, at Washington, 'for the increase of knowledge among men.' . . . It is not material that the names or number of persons to be bene-

fitted should be given if the purpose to be accomplished is made certain. The very idea of a public charity is that the benefit is to be generally bestowed. *Going* v. *Emery*, 16 Pick. 107 (26 Am. Dec. 645)." (My italics).
*Simpson* v. *Welcome* (1881), 72 Me. 496, 39 Am. Rep. 349.

See *Russell* v. *Allen, supra,* page 172, U. S., page 407, L. Ed; *Re: Funk Estate, supra.* It thus appears that the vagueness complained of is not a defect in Item 3 of the will at all; on the contrary it is an essential element in every public charitable trust, and definitely makes this Item a gift to a charitable purpose.

The fact that testatrix directed that the diaries should be edited, printed and published "at a reasonable cost," indicates that she was a provident person; that she intended to pay for this work from her own estate; that she had no thought of private gain in the matter; and that she was doing this for the benefit of the general public. It fits perfectly in her plan for a gift for public charity as shown by her use of the words "publication," "published" and "distribution" in the questioned Item as heretofore explained.

Another illuminating fact with respect to the meaning of Item 3 of this will, is the consideration given it by the appellees when they were serving as executors of the will and were charged with the due execution of this Item. In their final report as executors made in 1925, each paragraph of the complaint avers (and this averment is an admitted fact before us) that in the final report filed and presented by said defendants as co-executors they reported under oath to the court, among other things, as follows:

"That by the terms of the will the testatrix directed . . . (3) that diaries of Calvin Fletcher, grandfather of testatrix, be edited, and be printed

and published and distributed, the publication to be dedicated to Stoughton A. Fletcher, Jr., father of testatrix. *That has been done.*" (My italics).

There was no contention then that Item 3 was too vague or uncertain to be enforced as a public charitable trust. By their oath appellees show that they then understood this Item perfectly, and that it not only was clear and understandable enough to be performed, but that *they actually had performed it.* If that was truth in 1925, certainly the lapse of time has not changed it. It must be true today. There can be no lawful reason now why appellees should not be bound by the correct construction they gave the Item then.

It is further averred in the complaint and, by the demurrer, is before us as an admitted fact, that the defendants, The Union Trust Company of Indianapolis and Fletcher Hodges were co-executors of the Last Will and Testament of Laura Fletcher Hodges, deceased, and are at this time the Trustees of the testamentary trusts in the residue of the estate of said testatrix of the value of more than $500,000, and that they have wholly failed and defaulted in executing the public charitable trust created by the will relating to the editing, printing, publication, dedication and distribution of the diaries of Calvin Fletcher. That such diaries have not been edited, printed, dedicated, published or distributed. That said defendant, co-trustees, took all of the assets constituting the residue of decedent's estate into their hands as co-trustees, subject to, and impressed with said public charitable trust with respect to said diaries.

It is further averred in grammatical paragraph 9 of the second paragraph of complaint, and by the demurrer, is before us as admitted facts, as follows:

"9. That said defendants, The Union Trust Company of Indianapolis and Fletcher Hodges, in the consumma-

tion of a scheme to defraud this Court, the decedent, Laura Fletcher Hodges, and the trust established by her Last Will and Testament and the beneficiaries thereof, did make and file said Final Report of the due execution of their trust, which report was false and fraudulent, and which report purported to be verified by defendant Fletcher Hodges and by Arthur V. Brown, at that time President of defendant, The Union Trust Company of Indianapolis, and did falsely and fraudulently represent to the court that the diaries of Calvin Fletcher had been edited, printed, published, distributed, and dedicated to Stoughton A. Fletcher, Jr., thereby intending that this Court should be deceived and defrauded by said report and misrepresentation, and that this Court would accept and approve said report; that in truth and in fact the diaries of said Calvin Fletcher had not at that time, nor have they at any time since, been edited, printed, published, distributed and dedicated to Stoughton A. Fletcher, Jr., as provided by the terms of said Will of Laura Fletcher Hodges as above set forth, which facts the defendants, The Union Trust Company of Indianapolis and Fletcher Hodges, well knew at the time they made and filed said perjured report; that this Court was deceived, misled and defrauded by said false and fraudulent report, and did accept the false and fraudulent statements therein as to the due administration of said trust as true, and did approve said report, and that thereby said defendants did perpetrate a fraud upon this Court and the decedent, Laura Fletcher Hodges, the trust established by her Last Will and Testament, and the beneficiaries thereof, including plaintiff and the people of Indiana, were defrauded and damaged by the fraud and deceit of said defendants as herein alleged."

In 1895 the General Assembly of Indiana, under title "*An Act* providing for the protection, supervision and

safety of property or money willed or donated for benevolent purposes" enacted a law which ever since has been in full force and effect as follows:

"*Be it enacted by the General Assembly of the State of Indiana,* That, whenever property or money is willed or donated for benevolent public purposes, that it shall be the duty of the trustees of such property or money, incorporated or otherwise, to make a sworn report once a year to the Circuit Court of the county in which such property or money is to be appropriated according to the purposes of the donors; of the condition of such property or money, and how said money is invested, and the security for the same, and if the rents or interest of said property or money has been expended in accordance with the purposes of the donor; and said report is to bear the signature of all the trustees having charge of such property or money where such trustees reside; and upon failure of the trustees to make such sworn report, they are each to be subject to a fine of not less than fifty ($50) dollars.

"Sec. 2. It shall be the duty of the Judge of the Circuit Court of the county in which such trustees reside, to approve said report, and to see that the conditions of the donor of money for benevolent purposes be carried out according to the purposes of the donor; and if such trustees fail in any one year to render such report, the Judge shall issue an order compelling them to appear and show cause why they did not report, and all costs accruing in such cases, are to be paid by said trustee."

Acts of 1895, ch. 125, p. 247; §§ 7-714, 7-715, Burns' 1933.

Appellees tentatively complied with this law, by filing, presenting, and procuring the approval of the perjured report aforenoted, and were thereby relieved of the duty of making the yearly reports since as required by this statute.

It thus conclusively appears that the possession by appellees as trustees of that part of the residuary estate

that should have been expended in executing the trust expressed in Item 3 of the will, is based wholly upon their wilful and corrupt perjury, fully shown by their final report as co-executors to the Marion Probate Court, filed, presented and approved in 1925. I do not think this court should either ignore, condone, or approve this methodical and criminal effort of appellees to thwart testatrix's clear intention.

In *Vidal et al.* v. *Girard's Executors* (1844), 2 Howard (U. S.) 127, at page 146, 11 L. Ed. 205, at page 214, Mr. Binney for the Executors, among other things said:

> "In England, a charity, however general, always succeeds; there is no case in which it has failed."

See note and annotation "Charitable gifts; Definiteness," 163 A. L. R. 784. To me it seems clear that the majority opinion is wholly out of harmony with the law both in England and America, and that it is particularly out of harmony with the law in Indiana on the subject of public charitable trusts or gifts to charitable uses. *Crawfordsville Tr. Co.* v. *Elston Bank & Tr. Co., supra,* page 611; *Richards* v. *Wilson, supra.* In the latter case this court said, at pages 392 to 394:

> "That gifts to charitable uses are highly favored and are to be construed by the most liberal rules that the nature of each case, as presented, will permit of, rather than that the gift should fail and charitable purpose of the donor be not accomplished is a settled rule of equity long recognized in this state. (Many authorities) . . . They are construed so as to give them effect if possible, and to carry out the general intention of the donor, when clearly manifest, even if the particular form and manner pointed out by him cannot be followed. . . . So the principles of construction applied to public charities have evolved the judicial *cy pres* doctrine and under its application in circumstances like those here, the courts are required to look beyond the

institution, or trustee, particularly designated to administer the property given and the particular manner in which it is to be administered, to those for whose benefit it is to be administered. And if it appears that the latter were the real objects of the donor's bounty, the trust will survive the failure of the particular trustee and the particular method of administering the trust if the court can secure a trustee to carry into effect as near as may be the dominant purpose of the donor. And so in many cases it has been held that, notwithstanding the corporation to which the gift was to go and by whom it was to be administered was not incorporated or would not or could not administer the trust, nevertheless, the trust did not fail, but only the machinery for carrying it into effect, and that in such cases the court would supply not only the trustee but devise a mode of administration akin to that intended. (Many authorities). . . ."

See also *Erskine* v. *Whitehead, Exr., supra,* pages 364, 365; *Re: Funk Estate, supra.*

In the Vidal case Mr. Justice Story quoted, with approval, from *The Incorporated Society* v. *Richards* (1 Drury & Warren R. 258) the words of Lord Chancellor Sugden as follows:

". . . there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects for which *a court of equity has at all times interfered to make good that which at law was an illegal or informal gift;* and that cases of charity in courts of equity in England were valid independently of and previous to the Statute of Elizabeth." (43 Eliz.) (My italics).

In Indiana, the common law of England, (except certain statutes not material to the matter before us in this case) and which are of the general nature, not local to that kingdom, and not inconsistent with the federal and state constitutions, or with lawful federal or state statutes, is our governing law. § 1-101, Burns' 1946

Replacement; 1 R. S. 1852, ch. 61, § 1, p. 351. It has been our governing law, since the existence of our state, and prior to that when we had a territorial government as early as 1795. See Chap. 60, Rev. Stat. of 1843, page 1030, approved January 2, 1818. Necessarily the statement of the law in the Vidal case by Mr. Justice Story is the law of Indiana, applicable to the matters before us for review in this case and heretofore it has always been so held by this court. *McCord, Ex.* v. *Ochiltree et al.* (1846), 8 Blackf. 15, 17 and cases cited; *Barr, Trustee* v. *Geary, Auditor, supra,* page 28; *Barker* v. *Town of Petersburg* (1907), 41 Ind. App. 447, 451, 82 N. E. 996; *The Board of Commissioners of Rush Co. et al.* v. *Dinwiddie et al.* (1894), 139 Ind. 128, 140, 37 N. E. 795; *Haines et al.* v. *Allen et al.* (1881), 78 Ind. 100; *The Board of Comm'rs. of LaGrange Co. et al* v. *Rogers et al.* (1876), 55 Ind. 297, 300; *Sweeney et al.* v. *Sampson, Exr., supra.; Ex Parte Lindley, Executor* (1869), 32 Ind. 367; *The Common Council City of Richmond* v. *Ex rel. Mendenhall et al.* (1854), 5 Ind. 334. See also *Inglis* v. *The Trustees of the Sailor's Snug Harbor, supra,* page 117, U. S., page 624, L. Ed.

I think the unanimous opinion of the Appellate Court, 74 N. E. 2d 833, in this case is correct, and that the transfer should be denied.

For the several reasons given I am wholly unable to agree with the majority opinion.

NOTE.—Reported in 86 N. E. 2d 450.